PATTERSON, Retired Appellate Judge.
The appellant, R.A.S., appeals from his convictions for first degree sexual abuse of his stepdaughter A.M., § 13A-6-66(a)(3), Code of Alabama 1975; first degree sodomy of A.M., § 13A-6-63(a)(3), and second degree rape of A.M., § 13A-6-62(a)(l) (pursuant to a two-count indictment); first degree sexual abuse of his stepdaughter C.M., § 13A-6-66(a)(3); and first degree sodomy of C.M., § 13A-6-63(a)(3). For the convictions for the offenses involving A.M., he was sentenced to 10 years’ imprisonment, 25 years’ imprisonment, and 20 years’ imprisonment, respectively, and was fined $2,000, $5,000, and $3,500, respectively; the sentences were to run concurrently. For the convictions for the offenses involving C.M., he was sentenced to 10 years’ imprisonment and 25 years’ imprisonment, respectively, and was fined $2,000 and $5,000, respectively; the sentences were to run concurrently.
Because we are reversing those convictions based on our disposition of a single issue, we decline to address at this time the appellant’s other issues. The dispositive issue is whether the trial court committed reversible error in failing to instruct the jury as to the specific instances of alleged molestation that the prosecution had elected to proceed on. To put this issue in perspective factually, we turn to the evidence presented to the jury.
A.M., who was 16 years old at the time of trial, testified that she did not really remember the first time the appellant molested her, but she did remember that it occurred when she was 6 years old. The first time she actually remembers occurred when she was about six years old, when the appellant touched her vaginal area while they were outside their home in Fort Morgan and he had been working on rebuilding a 1955 Chevy automobile. She testified that this kind of activity occurred more than once and that the appellant also touched her breasts. A.M. also described a specific incident that occurred after her father had come to visit *110 her at her grandparents’ residence: the appellant took her to her grandfather’s toolshed and made her perform fellatio until he ejaculated. She could not remember the first time that he made her perform fellatio. She further testified that the “same type of behavior” continued after they moved to Florida; that it sometimes occurred in C.M.’s presence when the three of them went somewhere or when the victims’ mother was not around; that until she was 10 or 11 years old, she was sexually abused by the appellant “[mjaybe once every two weeks”; and that after she reached the age of 10 or 11 years, her performing fellatio on the appellant “became almost like an everyday thing.” She further stated that sometimes on trips to the store, the appellant made C.M. perform fellatio on him in her presence. She also testified that once, while the appellant was making her perform fellatio on him, C.M. came in and he commanded C.M. to perform fellatio. A.M. further testified that the appellant had sexual intercourse with her twice, but she specifically described only the incident that occurred in C.M.’s presence in a van.
Dr. John Franklin Shriner, a physician specializing in the examination of children who have been the victims of sexual abuse, testified that most of A.M.’s hymen had been destroyed, which he stated is consistent with a penetrating injury. He also testified that C.M. was too afraid to be examined.[1]
C.M., who was 13 years old at the time of trial, testified that before her twelfth birthday the appellant touched her “bottom front private” more than once and made her perform fellatio on him while he was sitting in a chair. She further testified that, after her twelfth birthday, the appellant rubbed his penis against her “bottom front” while she was sitting on a filing cabinet. She also testified that she observed A.M. perform fellatio on the appellant more than once — while the appellant was driving his vehicle, in her grandfather’s shed, and at two houses in Summerdale.
The prosecution also presented evidence of the victims’ prior statements concerning the appellant’s abusive behavior. The investigator for the Baldwin County Department of Human Resources testified that A.M. told her, among other things, that the appellant’s molestation was frequent and that when she was younger, it happened every day. She also testified that C.M. told her, among other things, that the appellant’s molestation had occurred on several occasions. Officer Lawrence Griffith, a child sexual abuse investigator, testified that he understood A.M. to state that she had been abused on more than 50 occasions by the appellant.
Officer Griffith also testified as follows regarding the appellant’s statement taken prior to his arrest. In regard to A.M., the appellant admitted that A.M. had performed fellatio on him six to eight times “off and on [for] probably about 6 years,” including approximately four times in the previous two years; that his abuse of A.M. started when they were living in Orange Springs, Florida; that it had been triggered by flashbacks of the sexual abuse he claims he suffered almost every day from the time he was 8 or 9 years old until he was 15; that the first incident of fellatio occurred when he was taking A.M. to school and he bribed her with candy; that the next incident was 2 or 3 months later and then a long time passed before it occurred again; that his most recent act of fellatio with A.M. was about six weeks before he made the statement; that A.M. would stimulate him until he ejaculated; that he had never had vaginal intercourse with A.M., although he said that once within two years before he made the statement he had “rubbed” her vaginal area with his penis; that he had rubbed A.M.’s vaginal area with his hands; and that he had touched A.M.’s breasts once. The appellant admitted to the following in regard to C.M.: that he had rubbed C.M.’s breasts and vaginal area with his hands, but that he had never tried to penetrate her; that C.M. had performed fel- *111 latió on him three or four times, all within the year before he made the statement; that when he first told C.M. what he did with A.M., she did not want to participate, so he got A.M. to persuade C.M. in exchange for permission to do something that they really wanted to do; that his most recent act of fellatio was with C.M. and that it had occurred the Friday before he made the statement; that on this last occasion, A.M. was at eheerleading practice and his wife was at the store; and that he had stopped her before he ejaculated because “something clicked in [his] mind and just told [him], ‘You’re doing wrong and you need help.’ ” He also stated that in the past year he made one of the victims act as a lookout while he abused the other victim and that sometimes he would have both of them perform fellatio on him. In explaining the victims’ long silence as to the molestation, the appellant stated that he told them that if they ever told, he would be arrested; that adults could only go to prison, that they could not get help; and that rather than go to jail, he would kill himself. The appellant also stated that “it was like [he] had no control”; that he “want[ed] to get this out of [him],” but he was worried about going to jail and losing his family; that he was glad the victims came forward because he did not want their lives “messed up” like his; that he wanted the victims and himself to get help; and that he was sorry.
The prosecution also presented the following evidence that the appellant engaged in flight: that the appellant and his wife (the victims’ mother) absconded and their bondsman did not see them again after he made bond for the appellant’s wife on October 3, 1994; that the bondsman’s investigator went to Fort Collins, Colorado, after finding out that the appellant had been arrested there and had made bond; that the investigator then followed the appellant toward Canada, and then to various locations in Florida, and finally to a deserted island off the Florida coast where he found the appellant “under water with his body submerged and just his lips out of the water under a limb hiding in the ocean”; and that the appellant never voluntarily returned to Baldwin County.
On this evidence, when defense counsel made a motion after the prosecution rested requesting that the prosecution elect which incidents it intended to prosecute,[2] the prosecutor elected the following specific incidents:
(1) As to the indictment charging the appellant with first degree sexual abuse of A.M., “the incident when [A.M.] was approximately 6 years old in the Gulf Shores area when the Defendant touched her vagina with his hand and she remembers that he had a car that he was working on.”
(2) As to the indictment charging the appellant with first degree sodomy of A.M., “the specific time that she remembers it happening in her early childhood after January 1985[3] as shown by the testimony of [the victims’ father], and that sodomy occurred in Baldwin County at her maternal grandmother’s house.”
(3) As to the indictment charging the appellant with the second degree rape of A.M., “the incident where [A.M., C.M., and the appellant] were in the van and [the appellant] took her to the back of the van and had her have sexual intercourse with him ... in the fall of 1993.”
(4) As to the indictment charging first degree sexual abuse of C.M., “prior to Christmas 1993, ... a time at their home in Summerdale when the Defendant touched her bottom private, vaginal area and buttocks.”
(5) As to the indictment charging first degree sodomy, “at a time prior to Christmas 1993, one time while riding in a ear with her sister [A.M.], [the appellant] had [C.M.] perform oral sodomy on him.”
Thereafter, the defense presented the testimony of George Raymond Kolb, who had been appointed to represent the appellant but who had been allowed to withdraw before the trial. Kolb testified that, on June 22, 1994, during his representation, the appellant’s wife brought the two victims to his *112 office for an interview. He stated that A.M. told him that she made up the allegations against the appellant because for three consecutive weekends he had refused to let C.M. and her spend the night with a friend; that she had been sexually active with two boys; that she had been sexually abused more than once by a neighbor when she was four or five years old; that during this sexual abuse, she took money and later cigarettes in exchange for her silence; ■ and that the appellant had never done anything to her. Kolb further testified that C.M. told him that A.M. had made up the allegations against the appellant to get him out of the house so they could spend the weekend with their friend; that A.M. had threatened to “beat the hell out of her” if she did not go along with the allegations; that she learned about male genitalia from A.M.; and that the appellant had never done anything to her.
Jose Delagarza, who worked for the appellant, testified that after the appellant was charged, A.M. denied the allegations against the appellant. He further stated that the appellant is a truthful person.
Betty Lou Nail, the appellant’s sister, testified that the appellant came from a strict, strong family background; that he was very involved with his wife and the victims and that he treated the victims as if they were his own children; and that although she and the victims have had a close relationship, they have never said anything to her about having been sexually abused.
Betty Eugene Bullard, the appellant’s mother-in-law, testified that the appellant and his family lived with her during 1991 and three or four times before 1991; that when they were not living with her, she saw them almost every day; that although she has had a close relationship with the victims, they did not confide to her that they had been sexually abused; that the appellant was very involved with his family and treated the victims as if they were his own children; that A.M. denied that she had been abused, that she is difficult to control, and that she has a tendency to lie at times; and that her residence had a garage, not “[o]ut behind the house,” but “on the side of the house.”
The appellant’s wife testified that she married the appellant in December 1985; that he always treated the victims as his own children; that A.M. was difficult to control at times; that the appellant was the disciplinarian of the family and the victims would get angry at him when he punished them, but they never showed any fear of him; that about the time the victims disclosed their allegations, the appellant had put the victims on restriction; that when she first learned of AM.’s allegations, A.M. told the appellant and her that she had told a classmate of the alleged sex abuse because “she was mad” and that she and the appellant went to AM.’s principal and “everything [was] straightened out”; and that even after the allegations were first made, the victims were still “doing the normal things” with the appellant.
The appellant’s wife also testified that when Officer Griffith came to their home and discovered that the appellant was at work, he told her that “it would look better on [the appellant]” if he came to the courthouse to talk to him; that when Officer Griffith asked how the victims could know what ejaculated semen tasted like and how a man’s penis felt, she stated that she believed that A.M. had been sexually active; that when asked if she believed the allegations were true, she explained that the appellant had been sexually abused as a child, but that she did not believe such abuse would make him a molester; that she went to the appellant’s place of employment and took him to talk with Officer Griffith; that during their 40-minute conversation on their way to the courthouse, she and the appellant expressed concern that the victims would be taken away from her, and she told the appellant that maybe he needed to tell Officer Griffith that he “did it so it would help us ... [b]ecause he thought the truth would come out.”
The appellant’s wife also stated, in regard to the appellant’s statement to Officer Griffith, that at the beginning of the interview when the appellant expressed his concern that he was worried that the allegations would be published in the local newspaper, Officer Griffith told him that “as long as he would talk to him, he said he wasn’t the judge or jury but he would do, do what he *113 could to help”; that at Officer Griffith’s insistence she was not present when the appellant gave the tape-recorded portion of his statement; and that when the appellant left, he seemed to think that everything was going to be all right. She also stated that when the victims returned home after the appellant had been arrested, they cried and asked how he was; that they repeatedly asked her if they could talk to him or write to him; that A.M. ultimately stated that if she could not see him, she was going to kill herself or ran away; and that they told her that the alleged events had not occurred and that they had made them up because they were mad.
In regard to the alleged incident between A.M. and the appellant at her parents’ residence in fall 1985 or spring 1986, the appellant’s wife testified that she, her parents, the appellant, and the victims were at the residence when the victims’ father came to visit; that after the victims’ father left, she and her mother were afraid that he would return and take them because he had “literally taken” them before and had tried to take them without her permission earlier that day; and that the victims stayed inside until she, the appellant, and the victims left for an outing on a boat.
In regard to her flight with the appellant, she testified that she and the appellant went to Colorado because C.M. wanted all of them to run away and wanted her to do whatever she could to help the appellant, because she thought A.M. was making false allegations against her and trying to get her in trouble too, and because the victims “acted like they didn’t want [her] around.” She stated that she and the appellant stayed in Colorado five months and that the appellant was arrested there.
The appellant testified that he was raised in a loving, closely knit family; that when he met the victims’ mother, A.M. was about two and one-half years old and C.M. was about a year old; that he treated them as if they were his own children; and that they moved to Florida in 1989 or 1990 and returned to Baldwin County about 1991. He further testified that when his wife had told him that A.M.’s principal had learned of A.M.’s allegations from a student, the appellant and his wife met with the principal; that during this meeting, the principal called A.M. in and she denied that the accusations were true; and that before the victims’ allegations to the police but after the meeting with the principal, they were mad at him because he had put them on restriction for changing the grades on their report cards.
In regard to his statement to Officer Griffith, the appellant stated that when his wife was taking him to talk with the officer, she told him that if he did not admit to the allegations she would never get her children back; that before he made the tape-recording, he asked for help for his family because he thought that at least one of the victims had to have a mental problem to make such accusations in the face of his innocence; that he asked about media coverage because of its potential effect on his failing company; that the officer “led [him] to believe” that things would be easier on him if he talked with him; that when he inquired about mental treatment for himself in lieu of jail, the officer stated that he was sure that he would get the type of help" he needed and did not mention that he would go to jail; that his 14 references in the tape-recording to needing help were references to needing help for his family, not for himself; that he believed by admitting to the allegations he would keep his family together because “that’s the way it was made out to me to believe that my family would stay together”; that he also believed by making himself appear to be guilty his family would get the help it needed; that the details he gave in his statement were the details that he overheard A.M. give C.M. when she was coaching her 2 or 3 days before he made his statement; and that he went to Colorado and Florida and remained a fugitive for 7 to 8 months to make enough money to retain counsel to replace court-appointed counsel who, he believed, was not experienced enough to prove his innocence.
In regard to the specific incidents elected by the prosecution, the appellant testified that in 1985, when A.M. was about six years old, he was rebuilding a ’55 Chevy automobile in Gulf Shores, but he did not put his hand on A.M.’s vagina; that when the victims’ father came to the victims’ grandpar *114 ents’ residence in late fall 1985 or early spring 1986, the residence did not have a shed and he did not make A.M. perform fellatio on him; that he did not take A.M. to the back of the van in fall 1993, and have intercourse with her in C.M.’s presence; that he never had intercourse with either of the victims; that before Christmas 1993, he did not touch C.M. in her vaginal area while they were at the home in Summerdale or have her perform fellatio on him while riding in a car. In conclusion, he testified that the victims’ allegations were the result of his putting the victims on restriction, that his statement to Officer Griffith was false, and that he had not sexually abused his stepdaughters.
Upon this evidence, the trial court instructed the jury, and defense counsel then entered the following objection:
“Now, the state has elected to go with those specific times. The Court in its instruction gave any time before the child attained the age of 12. We specifically requested the Court to give the exact times that the state elected to go with for the charges that were brought against [the appellant].
“In its charge, it did not give the specific time. It gave any time up until the age of 12 and that the Defendant was over the age of 16.
“Since the. state did go with that election, we believe that it is improper and prejudicial for the defendant that the jury could consider any time and not a specific time.
“If the court were to give the charge that was requested, [the jury] would only have to consider that one time that the state elected to do for the charge to go with.”
The trial court noted the appellant’s objec- . tion and overruled it. This ruling was in error.
“ ‘The doctrine of election operates to protect a defendant from being prosecuted for more than one offense in the same count of an indictment. Where the evidence discloses two or more offenses growing out of distinct and separate transactions, a court should grant a timely motion to require the State to elect.’
“Watkins v. State, 36 Ala.App. 711, 63 So.2d 293, 293-94 (1953).
“ ‘The need for election arises where there is but one count charging a single offense, but the proof shows more than one instance of that offense. The cases of Deason v. State, 363 So.2d 1001 (Ala. 1978), and Reed v. State, 512 So.2d 804 (Ala.Cr.App.1987), stand for the proposition that when the State has charged the accused with one offense in one count of the indictment, but has presented evidence that the accused committed that offense several times on several different dates, the State, upon proper motion, is required to elect the date of the offense on which it seeks a conviction.’
“J.D.S. v. State, 587 So.2d 1249, 1256 (Ala.Cr.App.1991).”
Sparrow v. State, 606 So.2d 219, 220-21 (Ala.Cr.App.1992).
Under facts similar to those in this case, the Alabama Supreme Court in Ex parte King, 707 So.2d 657 (Ala.1997) (five Justices concurring, one Justice concurring in part and dissenting in part, and three Justices dissenting), declined to overrule or to make an exception to the long-standing doctrine of election, as enunciated in Deason v. State, 363 So.2d 1001 (Ala.1978), and Watkins v. State, 36 Ala.App. 711, 63 So.2d 293 (1953). The evidence upon which the jury found King guilty of the two charges of sexual misconduct involving his minor stepdaughter is specifically recounted in Justice Maddox’s dissent to the majority opinion (in which Chief Justice Hooper and Justice See concurred), 707 So.2d at 660:
“The evidence established one distinct instance in January 1994 in which King abused the seven-year-old daughter of his common law wife while the child was sleeping with King in her mother’s bed. However, evidence was also presented that King had sexually abused this stepdaughter five times — ‘three times “before Christmas” and two times “after Christmas.”’ King v. State, 707 So.2d 652, 653 (Ala.Cr.App.1996).”
*115 In upholding the settled caselaw, the majority stated:
“[T]he state says that one of the sexual abuse convictions can properly stand, because given that most of the evidence related to a single incident, there could be no doubt that the jury convicted King on one count on the basis of that incident. Accordingly, the state says, any error in failing to order an election related to the conviction under Count I ... was harmless error.
“However, it is pure speculation to suggest that that single incident was the basis of the jury’s conviction on one count of sexual abuse. There was evidence at trial of five incidents of sexual abuse. Indeed, the state itself contends that ‘other incidents of sexual abuse were proven by the prosecutor in this case.’ There is simply no way to know which incident or incidents of abuse underpinned the jury’s verdict.”
707 So.2d at 659. In so holding, the Court implicitly rejected the dissent’s urging that the Court “approach child molestation cases more carefully, in order to strike a proper balance between the defendant’s rights, as outlined in Deason, supra, and the victim’s age and inability to recount every detail of each incident of abuse.” 707 So.2d at 660.
The prosecutor in this case properly elected which proven, single instance of each charged offense the jury was to consider in considering whether the appellant was guilty of the charged offenses. See also Deason v. State (where the prosecutor directed much of his proof of the charged offense of carnal knowledge to a specific occasion, but further proved additional such occasions, the prosecutor should have been required to elect which incident was the subject of the indictment); Reed v. State, 512 So.2d 804 (AIa.Cr. App.1987) (where the victim, in a prosecution for sexual abuse, testified as to several separate incidents of sexual molestation by the defendant, the prosecution should have been required to elect a single incident upon which a conviction was being sought). It stands to reason that an election is without effect if the jury is not instructed as to the election. See, e.g., J.D.S. v. State, 587 So.2d 1249, 1256 (Ala.Cr.App.1991); Reed v. State, 512 So.2d 804, 809 (Ala.Cr.App.1987) (“The record reveals that the jury was never instructed as to exactly which act or incident was to be considered in their determination of guilt.”) (emphasis in original).
The attorney general argues that the trial court’s “oral charge to the jury substantially provided the jury with limits placed on the admission of evidence.” The attorney general specifies the following instruction:
“Now, when a person is on trial for the alleged commission of a particular crime, evidence of the alleged commission of another separate offense is normally not admissible.
“In other words, the trial progresses on the evidence as to that particular offense charged in the indictment and no evidence is introduced normally pertaining to any other alleged offenses.
“This rule exists because when a person is charged with a particular offense, the evidence should be addressed to that charge and not to some other alleged crime. There are, however, exceptions to this general rule.
“These exceptions permit evidence, but permit it only in a very limited fashion and for special use. In this ease, evidence of alleged events occurring after the allegations in this indictment, that is, after the children attained the age of 12, was admitted for a limited purpose.
“Evidence in the alleged commission of another crime by an accused may be considered with the other evidence in the case if that evidence warrants a finding that both the now-charged crime in the indictment, now being tried, and the other crime were committed under or pursuant to a single plan or design or in rebuttal to evidence adduced by the defense in this case.
“Your role in this case is to determine the guilt or innocence of the defendant of the offenses charged in the indictments; that is, sodomy in the first degree, sexual abuse in the first degree, and rape in the second degree.
“The defendant is not charged in this case, I don’t want you to understand that *116 the defendant is not charged in this case with sodomy in the first degree or sexual abuse in the first degree after the children attained the age of 12.
“Any testimony with respect to an alleged transaction occurring after they attained the age of 12 is admitted solely for the consideration of the jury in determining the guilt or innocence of the defendant of the crimes charged in the indictments and how that evidence may be related to such questions as the plan,' design, or scheme, 'or in rebuttal or in answer to allegations or evidence produced by the defénse.
“You are to look to the evidence concerning the crimes charged in the indictments and you are not to decide whether or not the defendant was accused of or guilty of any other' offenses and the offenses are that have been addressed to you or as I have read them to you contained in the indictments.
“The other evidence is only allowed in that limited purpose, allowing you to consider it in determining the guilt or innocence of the accused in this case and not as to any other case.” .
The attorney general’s observation that the victims testified to limited specific facts and to limited specific time frames is correct. However, the fallacy in the state’s argument is that the jury was not instructed that in arriving at its verdicts it was to limit its consideration to the specific, though limited, facts that the prosecutor chose to support each charged offense with. There was no guidance or explanation whatsoever given to the jury regarding the purpose of the admission of evidence of the various incidents that occurred before the victims attained the age of 12;-'the'-court limited the jury’s consideration only in regard to any alleged acts occurring after the victims attained the age of 12. Thus, it remains unclear upon which specific incident each verdict was based. Compare Knight v. State, 495 So.2d 712 (Ala.Cr.App.1986) (where the prosecution elected a specific event upon which to underpin the indicted charge and the trial court instructed the jury that its sole question was whether the victim was raped during the specified time frame of the specified event, the jury’s verdict was clearly based on a specified incident that occurred during a specified month before the victim’s twelfth birthday and not on any proven incident that occurred after her twelfth birthday).
In reversing the convictions in this case, we are mindful of the fact that, as to most of the charged offenses, the question presented by the evidence was not whether the appellant was guilty of one specific incident and not another, but whether the victims were credible or whether the appellant’s denial that the molestation ever occurred was more credible. In other words, the evidence tending to prove most of the offenses would not have led a juror to conclude that the molestation occurred on one occasion but not on another. However, under Ex parte King, we must reverse all the convictions in this case.
We agree with Justice Maddox’s observation in his dissent in Ex parte King that “child molestation, especially by one who is acting as a parent, is probably the most horrible crime besides murder committed against young children, because of their age, and because they are in a developmental stage, and because they rely on adults.” 707 So.2d at 661. These victims are “the most vulnerable among our children.” 1989 Cal. Stat. ch. 1402, § 1(a), p. 6138. The ease before us presents yet another example of the problems arising from the application of Alabama’s strict election rule to the prosecution of a resident child molester for multiple acts occurring over an extended period. See also, e.g., Sparrow v. State, 606 So.2d 219 (Ala.Cr.App.1992) (although, as Judge Mon-tiel noted in his special writing, “[t]he prosecution proved that the [resident-defendant] sexually abused and sodomized the female victim over a two-year period from March 1989 to March 1991, when the child was from five to seven years old,” id. at 220, the appellant’s conviction was reversed on the majority’s finding that the prosecution designated the wrong occasion in its election even though such a mistake was understandable given the victim’s confusing testimony). In our opinion in R.L.G. v. State, 712 So.2d 348 (Ala.Cr.App.1997), released today, in recognition of the unique problems posed by the *117 prosecution of alleged resident child molesters, we adopted a less strict election rule to be applied to “generic evidence” cases. This expanded rule cannot be applied here because the prosecution’s evidence was not purely generic. However, we do find it appropriate here to urge the Alabama Supreme Court, as we did in R.L.G., to consider extending our expansion of the strict election rule to apply to cases based upon generic and specific evidence, such as this one. In our opinion, such expansion would achieve a fairer balance of the realities of the nature of the evidence of sex offenses repeatedly committed against the same child by a resident abuser and the rights of the defendant, the nature of which is peculiar to the narrow class of sex offenses allegedly committed by a resident molester.
The foregoing opinion was prepared by Retired Appellate Judge JOHN PATTERSON while serving on active duty status as a judge of this court under the provisions of § 12 — 18—10(e).
REVERSED AND REMANDED.
LONG, P.J., and MeMILLAN and COBB, JJ., concur.
BROWN, J., concurs specially.
BASCHAB, J., recuses.

. The physician's observation of C.M.'s traumatized demeanor was consistent with the following testimony of the Baldwin County Department of Human Resources investigator: "I have never seen a child's demeanor the way [C.M.'s] was on [the day the cases were presented to the grand jury]. She was sucking her thumb, [lying] on the floor.... She was just, like, had to be dragged into the Grand Jury room.... It was very disturbing.” C.M. also testified that she lay curled up like a ball on the floor that day because she was afraid of the appellant.

. Before trial, the appellant had filed a written motion to elect and the trial court entertained oral argument on that motion.

. The prosecutor corrected this date and substituted it with "[l]ate fall of 1985 or early spring of 1986.”