[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 462 
Maurice Ray Webster, Mike Stewart, and Bill Greer appeal their convictions under Alabama's Code of Ethics, § 36-25-1 et seq., Ala. Code 1975. We affirm in part and remand.
Webster, the owner of Webster Construction Company, was convicted of offering things of value for the purpose of influencing official action, a violation of § 36-25-7(a), Ala. Code 1975 (count three of the indictment), and, as an accomplice, of using an official position or office for personal gain, a violation of § 36-25-5(a), Ala. Code 1975 (count one of the indictment). He was sentenced to five years' imprisonment for each conviction, to run concurrently. Stewart, county commissioner for district one in Marshall County, was convicted of using his official position or office for personal gain, a violation of § 36-25-5(a), Ala. Code 1975 (count one of the indictment). He was sentenced to five years' imprisonment. Greer, county commissioner for district four in Marshall County, was convicted of using his official position or office for personal gain, a violation of § 36-25-5(a), Ala. Code 1975 (count one of the indictment), and of soliciting or receiving things of value for the purpose of influencing official action, a violation of §36-25-7(b), Ala. Code 1975 (count two of the indictment). He was sentenced to five years' imprisonment for each conviction, to run concurrently.[1]
The appellants each raise several issues on appeal, and we address each in turn.
The appellants argue that their convictions should be reversed because, they say, their convictions were based on the uncorroborated testimony of accomplice Elton Sims and, therefore, that they were each *Page 463 
entitled to a judgment of acquittal. We disagree.
Initially, we note that "`[i]n determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'"Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State,697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v.State, 602 So.2d 462, 464 (Ala.Crim.App. 1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So.2d 691, 696
(Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850
(Ala.Crim.App. 1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040,1042 (Ala. 1978).
Viewed in the light most favorable to the State, the evidence adduced at trial indicated the following. In 1991, Sims was elected to the county commission of Marshall County to represent district three.[2] In 1994, Stewart was elected as the county commissioner for district one. In 1995, Greer was elected county commissioner for district four. In 1997, Alabama's competitive bid law, § 39-2-1 et seq., Ala. Code 1975, was changed to allow county commissioners to award a contract without soliciting bids if the contract was less than $50,000.[3]
Sims, who testified pursuant to a plea agreement with the State,[4] stated that he knew both Webster and Greer through the Marshall County Commission and that he learned of the change in the competitive bid law from Greer in 1997. After the change in the law, Sims said, Greer suggested that he use Webster Construction Company to complete some of the road projects in his district. According to Sims, Greer told him that he "could probably do a little better with Mr. Webster than . . . with the other contractors" and that Greer rubbed his fingers together, which Sims understood to mean that he could receive some monetary value if he used Webster's company. (R. 122-23.) Sims stated that *Page 464 
he began using Webster Construction Company on some of the projects in his district. According to Sims, he and Webster would set a price on the project between themselves and "then anything above the price that we set that the purchase order was made for, I would get 50 percent above that and he would keep 50 percent above that." (R. 123-24.)
Sims testified that typically, when a road project was underway in his district, he would get a "requisition" for the amount of money he needed for the project and when the work was completed, he would put the work order with the requisition and take both to the county commission's office in the courthouse in Guntersville, where Mary Susan McCormick, one of two accountants who worked for the commission, would issue a check for the project. Sims said that he would sometimes wait for the check and hand deliver it to Webster, but that sometimes McCormick would mail the check to Webster. At some later date, Sims said, Webster would pay him, per their arrangement, 50 percent of the amount in excess of the actual cost of the project. According to Sims, the average amount he would receive from Webster on any given project was approximately $5,000.
Sims further testified that at one point after he had used Webster Construction Company for some time, Greer approached him about having Webster Construction Company "do a project" and he approached Webster and Webster agreed to "do a project." (R. 128.) According to Sims, however, there was no project. Rather, it was merely a plan for him, Greer, and Webster to receive money. Sims testified that he submitted a requisition and work order and had a $3,000 check made payable to Webster,[5]
although Webster Construction Company actually did no work. According to Sims, Webster kept $1,500, he received $1,000, and he gave Greer $500. Sims testified that he remembered Greer telling him at least once or twice that he was "running short of cash" and that "it was time for him to do a project." (R. 132.)
Sims also testified that at another point after he had used Webster Construction Company for some time, although he could not say exactly when, Greer approached him and told him to start using the name Bill Runyans, who was Webster's son-in-law, instead of Webster's name "because Mr. Webster's name was showing up on the computer printout too much, and they didn't need his name to show up so much on the computer printout." (R. 129-30.) At that point, Sims said, he began using the name Runyans, but the projects were still being completed by Webster Construction Company.
Sims testified that at one point he was present when Greer told Stewart that he should use Webster Construction Company for his projects. Sims stated that at no point during that conversation did Greer tell Stewart that he could receive money for using Webster Construction Company, but that Webster had told him at some point that the arrangement he had with Sims "was the way he dealt with the county," i.e., that he would set a price and then share with the commissioner whatever profit he made over that price.[6] (R. 134.) *Page 465 
Sims testified that he had no knowledge of Stewart's ever receiving any money from Webster for any road projects done in Stewart's district, and that Stewart had never told him that he had received money from Webster. In addition, Sims stated that he had never witnessed Webster paying Greer any money.
According to Sims, on most of the projects that Webster Construction Company did for him bills submitted would reflect the total cost of the work on the project despite the fact that county employees, who were already being paid by the county, "had to do most it." (R. 131.) However, Sims stated that Webster Construction Company had always done a "tremendous job" on the projects done in Sims's district. (R. 147.) Sims also stated that Webster Construction Company had equipment, specifically a track hoe, that the county did not have, and that at least some of the work Webster Construction Company had done could not have been done by the county because it lacked the necessary equipment.
To corroborate Sims's testimony, the State presented evidence that during a routine audit of the Marshall County Commission in the summer of 1998, Karen O'Bannon, a senior account examiner with the Alabama Examiners of Public Accounts, discovered an unusual pattern of payments to a particular vendor, specifically, monthly payments to Webster Construction Company in exact dollar amounts. O'Bannon testified that, during her audit, Billy Cannon, the chairman of the Marshall County Commission, approached her and told her that he had some concerns about how some commissioners in Marshall County were spending money. O'Bannon testified that, following her audit and conversations with Cannon and other people in the area, a complaint was filed with the attorney general's office.
The State also presented evidence regarding the normal procedure for requesting and paying outside vendors for doing work for the county. Mary Susan McCormick testified that the commissioner who wants to make a purchase will submit a purchase requisition, i.e., a request to make a purchase; that when the purchase is approved by the county, a purchase order number is assigned to the requisition; that after the work is completed, the vendor then mails an invoice to the county for the purchase; and that the county then makes a check payable to the vendor and mails it to the vendor. The checks are normally computer-generated because, according to McCormick, the county does not like the checks to be typewritten. However, McCormick said that she had typewritten several checks to several different vendors, most of which were to Webster Construction Company, rather than using the computer to create the checks and then mailing them. According to McCormick, she did this several times pursuant to requests by Sims and Greer, who would personally deliver an invoice from Webster Construction Company and then request that she type a check immediately. McCormick testified that one time when Greer came in an asked for a check to be made payable to Webster Construction Company, she asked him *Page 466 
"Where's my cut out of this?" (R. 174.) In response, McCormick said, Greer said that he did not know what she was talking about and he told her, "Hush your mouth. Don't be saying that. Don't be talking like that." (R. 174.) McCormick testified that Stewart had asked for a typed check payable to Webster Construction Company only one time, when the check she had previously mailed to Webster had been lost in the mail.
Finally, the State presented evidence regarding three road projects completed in Greer's district by Webster Construction Company — Brasher's Chapel Road, Johnson Road, and Armstrong Road — and one project done by Webster Construction Company in Stewart's district — Saylor's Gap Road. The projects had been done between 1997 and 2000. The State presented testimony from a Marshall County engineer as well as an "assistant preconstruction engineer" employed with the Alabama Department of Transportation, both of whom testified, based on certain information that had been provided to them, that the cost of the four projects should have been less than what Webster Construction Company had charged the county for the projects. The State also presented testimony from various county employees regarding those projects, which indicated that, although Webster Construction Company had been hired to do the projects, county employees actually did a large portion of the work. This testimony also indicated that Webster Construction Company had done a good job on all of the projects, but that it had not done anything that county employees could not have done themselves, although it would have taken longer to complete the projects without the help of Webster Construction Company. One county employee, Lynn Waldrop, a former road foreman for district one in Marshall County, testified that during the Saylor's Gap Road project Webster Construction Company was hired to load chert at a local chert pit. When asked how many times in the past he had needed assistance in loading chert at the pit, Waldrop testified: "Well, that's actually the only time they hired anybody." (R. 325.) Another county employee, Denford Oliver, a road foreman in district four in Marshall County, testified with respect to various projects. When asked if he remembered a time when Webster and Runyans "started showing up on various projects" that he was working on and whether "that was something kind of new when they started showing up," Oliver replied, "yes, sir." (R. 384.)[7] *Page 467 
In addition, the State introduced into evidence the requisition forms, invoices, and checks associated with the projects. The State introduced evidence of: (1) 25 checks to Webster and 1 check to Runyons, all authorized by Greer, totaling approximately $150,000 for various contracts in Greer's district; (2) 12 checks to Webster totaling approximately $92,269 and 17 checks to Runyons totaling approximately $86,000-$96,000, all authorized by Sims, for various contracts in Sims's district; and (3) 4 checks to Webster authorized by Stewart totaling approximately $40,100 for a contract in Stewart's district. Many of the checks made out to Webster for work performed in Greer's district and Sims's district were issued on the same day the requisition and purchase order and/or invoice were issued. Further, several of the checks for work in Greer's district and Sims's district were issued before Webster Construction Company submitted an invoice, and, on two occasions involving Sims's district, more than a week before the invoice was submitted.
Section 12-21-222, Ala. Code 1975, provides:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
In Arthur v. State, 711 So.2d 1031 (Ala.Crim.App. 1996), aff'd,711 So.2d 1097 (Ala. 1997), this Court stated the following regarding the corroboration of accomplice testimony:
 "`An accomplice's testimony must be supported by evidence connecting the defendant with the commission of the offense rather than merely showing that the offense occurred or the circumstances thereof. Code of Alabama 1975, § 12-21-222; Miles v. State, 476 So.2d 1228 (Ala.Cr.App. 1985); Jackson v. State, 451 So.2d 435 (Ala.Cr.App. 1984).' Hodges v. State, 500 So.2d 1273, 1275 (Ala.Cr.App. 1986).
 "`"Corroboration need only be slight to suffice." Ingle v. State, 400 So.2d 938, 940 (Ala.Cr.App. 1981). "While corroborating evidence need not be strong, it `. . . must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt.' McCoy v. State, 397 So.2d 577
(Ala.Crim.App.), cert. denied, 397 So.2d 589 (Ala. 1981)." Booker v. State, 477 So.2d 1388, 1390
(Ala.Cr.App. 1985). "However, the corroboration need not be sufficiently strong by itself to warrant a conviction." Miles v. State, 476 So.2d 1228, 1234
(Ala.Cr.App. 1985). The requisite corroborative evidence is determined by a process of elimination or subtraction. Caldwell v. State, 418 So.2d 168, 170
(Ala.Cr.App. 1981). "The means for analyzing the evidence to determine if there is sufficient evidence to corroborate testimony of an accomplice is to set aside the accomplice's testimony and determine whether or not the remaining evidence tends to connect the defendant with the commission of the offense." Leonard v. State, 459 So.2d 970, 971
(Ala.Cr.App. 1984). . . . Circumstantial evidence is sufficient to show corroboration. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App. 1984). See also McConnell *Page 468 v. State, 429 So.2d 662 (Ala.Cr.App. 1983).'
"Hodges v. State, 500 So.2d at 1275-76.
 "In Ware v. State, 409 So.2d 886 (Ala.Cr.App. 1981), writ quashed, 409 So.2d 893 (Ala. 1982), this court quoted Andrews v. State, 370 So.2d 320, 322
(Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala. 1979), stating:
 "`"The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. `Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' Malachi v. State, 89 Ala. 134, 140-141, 8 So. 104, 106 (1889); Smith v. State, 230 Ala. 413, 416, 161 So. 538
(1935); Brown v. State, 31 Ala.App. 529, 19 So.2d 88 (1944). The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974); Dykes v. State, 30 Ala.App. 129, 1 So.2d 754 (1941). Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. State v. Canada, 107 Ariz. 66, 481 P.2d 859, cert. denied, 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). See Pearce v. State, 26 Ala.App. 492, 495, 164 So. 114, cert. denied, 231 Ala. 150, 164 So. 118 (1935) ('(B)ut, as we read the cases, the corroboratory evidence, if it meets the test of "tending to connect the defendant with the commission of the offense," need not be, in and of itself alone, that tending in any wise to fasten guilt upon the defendant'); 23 C.J.S. Criminal Law § 812(3) (1961). The sufficiency of corroborating evidence is established if its probative value tends to connect the defendant with the commission of the crime. Lowe v. State, 32 Ala.App. 176, 22 So.2d 618 (1945). The corroboration of an accomplice may be shown by circumstantial evidence. Blevins v. State, 56 Ala.App. 115, 319 So.2d 734, cert. denied, 294 Ala. 753, 319 So.2d 739
(1975); Tidwell v. State, 23 Ala.App. 409, 126 So. 186 (1930).
 "`"In certain instances, association with the accomplice tending to show the accused's proximity, chronologically and geographically, to the alleged offense may furnish sufficient corroboration. Ross v. State, 74 Ala. 532 (1883); DeGraaf v. State, 34 Ala.App. 137, 37 So.2d 130 (1948)." 370 So.2d at 322.'
"409 So.2d at 891.
 "Thus, to constitute sufficient corroboration, a fact or circumstance may tend to support the accomplice's version, thereby confirming his credibility, but in order to provide sufficient corroboration of accomplice testimony, the evidence must connect the accused with the commission of the offense. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App. 1984)."
711 So.2d at 1059-60.
After carefully reviewing the record, we conclude that the State presented evidence that was minimally sufficient under Alabama law to allow submission of the charges to the jury. Corroborating evidence of the kind envisioned by § 12-21-222 need only be slight to suffice; it is *Page 469 
sufficient if it merely tends to allow the jury to connect the defendant with the commission of the offense.[8] As Justice Almon, writing for the majority in Thompson v. State,374 So.2d 388, 389 (Ala. 1979), noted: "There is a fine line drawn between corroborative evidence which does no more than raise a suspicion of guilt and evidence of such a nature that it tends to connect the defendant with the commission of the offense." In the present case, the State presented evidence of unusual patterns of payments to vendors by the county — records indicating numerous payments to a specific vendor (Webster Construction Company) in exact dollar amounts for county projects initiated by Greer and Stewart and coinciding with the change in the competitive bid law. This evidence connects Greer and Stewart with Webster and indicates that the three men were involved in various road projects for the county. This evidence indicates that the appellants, through their business dealings, had the opportunity to commit the alleged offenses and, in conjunction with other evidence, may be sufficient to corroborate Sims's testimony. The State also presented evidence tending to indicate that Webster's involvement in certain projects initiated by Greer and Stewart was unnecessary, somewhat unusual, and eventually cost the county more than a particular job was actually worth. Evidence indicating that Greer and Stewart initiated Webster's involvement in unnecessary and overpriced road projects for the county tends to connect all three men to the charged offenses and strengthens the probative, incriminating force of Sims's testimony. Finally, the State presented evidence indicating that in certain county projects in which Greer was involved the normal payment procedures for outside vendors were not always followed with respect to Webster Construction Company. This evidence tends to indicate that Greer treated Webster Construction Company differently than other vendors, at least insofar as county payments to it were concerned.
The appellants correctly point out that the State's witnesses were extensively cross-examined, especially with respect to the necessity of the involvement of Webster Construction Company in the road projects and the reasonableness of the payments made to it by the county, and *Page 470 
that there was conflicting evidence presented as to their involvement in or connection with the offenses alleged. However, this Court's role is not to say what the facts are; it is to judge only whether the evidence was legally sufficient to allow submission of the charges to the jury.
 "Speculation and suspicion will not support a conviction based on the uncorroborated testimony of an accomplice, . . . but the weakness of the corroborating evidence, in and of itself does not preclude a finding that such evidence tends to connect the defendant with the commission of the offense. . . . Where such a finding is made, the weakness and inconclusiveness, vel non of the corroborating evidence is determined by the jury."
Thompson, 374 So.2d at 390-91.
Stewart also contends that the State failed to present "sufficient evidence to prove beyond a reasonable doubt that [he] had used his office for personal gain." (Stewart's brief at p. 4.) He argues that he was entitled to a judgment of acquittal. Although there were significantly fewer checks issued to Webster Construction Company for work in Stewart's district than in Sims's or Greer's districts, that does not necessarily render the State's evidence insufficient as a matter of law. Sims testified that Webster told him "that the way he did work with the county was to set a price and then share any over that with the commissioner." (R. 134) This testimony, coupled with the corroborating evidence previously discussed (specifically, evidence that Webster Construction Company's involvement in Stewart's Saylor's Gap Road project was unnecessary and costly to the county) was sufficient, when all reasonable inferences are indulged in favor of the State, to allow the case to go to the jury. From the evidence, a reasonable inference can be drawn that Webster did business the same way with Sims, Greer, and Stewart. Whether that inference should have been drawn from the evidence, i.e., whether a finding should have been made that Webster actually paid Stewart in exchange for Stewart's hiring his company for county projects in his district, was a question for the jury. The trial court did not err in denying Stewart's motion for a judgment of acquittal.[9]
Webster also contends that the Legislature did not intend for anyone other than public officials or employees to be prosecuted under the Alabama Ethics Code without the safeguards of §36-25-4(c), Ala. Code 1975.
Webster, in his motion for a judgment of acquittal at the close of the State's case, began to argue that he could not be guilty of misusing a public office; however, the trial court interrupted, asking whether Webster had been charged as an accomplice. Later, in his renewed motion at the close of all the evidence, Webster argued "that the way the statute is written, an individual [who does not hold public office] cannot misuse a public office." (R. 611.) In his written motion for a judgment of acquittal or, in the alternative, for a new trial, Webster argued that the enforcement of the Alabama Ethics Code rested with the Ethics Commission; that the allegations should have gone before the Ethics *Page 471 
Commission before the attorney general became involved; and that the due-process requirements of § 36-25-4(c) were not followed. Webster specifically noted that he had not received a hearing before the Ethics Commission before the attorney general became involved.
This issue is not properly before this Court because it was raised for the first time in Webster's posttrial motion. "A defendant who fails to raise an issue regarding the regularity of proceedings preliminary to his trial may not ask that the issue be reviewed on appeal when it was first presented in a motion for new trial." DeFries v. State, 597 So.2d 742, 747 (Ala.Crim.App. 1992). See also Pugh v. State, 587 So.2d 1283 (Ala.Crim.App. 1991).[10]
Webster further contends that the "legislature intended that [the Ethics Code] apply to public officials or public employees only. The chapter is entitled `Code of Ethics for Public Officials, Employees, Etc.'" (Webster's brief at p. 32.) Arguing that "[t]he attorney general should not be able to subjectively charge someone like Webster within the web of the Ethics Act when it is unclear if such act applies to him" (Webster's brief at p. 33), Webster maintains that he should have been charged under §13A-10-61, Ala. Code 1975, ("Bribery of public servants").
We note, initially, that § 36-25-1(20) defines a person as "[a] business, individual, corporation, partnership, union, association, firm, committee, club, or other organization or group of persons." Section 36-25-1 also defines several additional terms, including, but not limited to, business, governmental corporations and authorities, law-enforcement officer, lobbyist, and principal. Finally, several subsections of the chapter contain provisions wherein the entity whose action is the focus of the subsection is a "person," including, but not limited to, § 36-25-5(d) ("No person shall solicit. . . ."); and § 36-25-7(c) ("No person shall offer or give. . . .").[11]
Similarly § 36-25-12, Ala. Code 1975, contains language clearly encompassing both the offering or giving something of value by a "person" to "a member or employee of a governmental agency, board, or commission that regulates a business with which the person is associated" and the soliciting or receiving of something of value by a "member or employee of a regulatory body." See also § 36-25-7(a) ("No person shall offer or give to a public official or public employee or a member of the household of a public employee or a member of the household of the public official and none of the aforementioned shall solicit or receive. . . ."). The definition of "person" and the inclusion and definitions of the additional terms defined in § 36-25-1
indicate that the Legislature did not intend to limit the application of the Ethics Code to public officials and employees.
Furthermore, and, we believe, more to the point of Webster's argument, Webster was convicted under § 36-25-5(a) (count *Page 472 
one of the indictment) under a complicity theory. See § 13A-2-23, Ala. Code 1975. It was within the State's discretion to charge Webster with an ethics violation. See Hunt v. State,642 So.2d 999, 1004 (Ala.Crim.App.), aff'd, 642 So.2d 1060 (Ala. 1994). For these reasons, Webster's claim is without merit.
Greer also challenges the constitutionality of the Alabama Ethics Code. Specifically, he argues that, because the Ethics Commission and the attorney general have dual enforcement authority under § 36-25-27(c), Ala. Code 1975, and because the procedural due process provisions of § 36-25-4(c) apply only to proceedings initiated by the Ethics Commission, the attorney general's initiation of this prosecution under § 36-25-27(c) violated Greer's constitutionally protected right to equal protection under the law. The thrust of Greer's argument is that § 36-25-27(c) allows the Ethics Code to "be applied unevenly" (Greer's brief at p. 40), so as to deny him the benefit of the procedural safeguards provided by § 36-25-4(c). This issue is not properly before this Court because it was raised for the first time in Greer's posttrial motion for a judgment of acquittal or, in the alternative, a new trial. A constitutional challenge to the regularity of proceedings preliminary to trial must be timely and is waived if raised for the first time in a posttrial motion. See DeFries, 597 So.2d at 747. We find unpersuasive Greer's argument that this constitutional issue was properly preserved because he filed a pretrial motion to dismiss count four of the indictment and stated as a ground for the motion that "[a]s separate and independent grounds, unequal enforcement of the statute and the selective prosecution of these defendants is unconstitutional." Greer's specific challenge to count four of the indictment was not sufficient to preserve a constitutional challenge to his convictions under counts one and three of the indictment. "`The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.'" Culp v. State,710 So.2d 1357, 1359 (Ala.Crim.App. 1996), quoting Ex parteFrith, 526 So.2d 880, 882 (Ala. 1987). "Even constitutional claims may be waived on appeal if not specifically presented to the trial court." Brown v. State, 705 So.2d 871, 875
(Ala.Crim.App. 1997).
As a final matter, Greer contends that the trial court erred by refusing to require the State to elect which of the specific acts it was going to proceed under; by allowing the jury to consider both counts one and two of the indictment; and by entering a judgment of conviction on both counts.
First, Greer argues that the trial court erred by not requiring the State to elect a particular alleged illegal transaction to submit to the jury. In R.A.S. v. State, 718 So.2d 108
(Ala.Crim.App. 1997), aff'd, 718 So.2d 117 (Ala. 1998), this Court addressed the general rule concerning the doctrine of election:
 "`"The doctrine of election operates to protect a defendant from being prosecuted for more than one offense in the same count of an indictment. Where the evidence discloses two or more offenses growing out of distinct and separate transactions, a court should grant a timely motion to require the State to elect."
 "`Watkins v. State, 36 Ala.App. 711, 63 So.2d 293, 293-94 (1953).
 "`"The need for election arises where there is but one count charging a single offense, but the proof shows more than one instance of that offense. *Page 473 
The cases of Deason v. State, 363 So.2d 1001 (Ala. 1978), and Reed v. State, 512 So.2d 804
(Ala.Cr.App. 1987), stand for the proposition that when the State has charged the accused with one offense in one count of the indictment, but has presented evidence that the accused committed that offense several times on several different dates, the State, upon proper motion, is required to elect the date of the offense on which it seeks a conviction."
 "`J.D.S. v. State, 587 So.2d 1249, 1256
(Ala.Cr.App. 1991).'"
718 So.2d at 114, quoting Sparrow v. State, 606 So.2d 219,220-21 (Ala.Crim.App. 1992). See also R.L.G. v. State,712 So.2d 348 (Ala.Crim.App. 1997).
In Giddens v. State, 565 So.2d 1277 (Ala.Crim.App. 1990), this Court stated:
 "In Willis v. State, 134 Ala. 429, 33 So. 226
(1901), the defendant was charged with embezzlement. A question raised in Willis was `whether the prosecution could be compelled to elect to prosecute for one particular act of embezzlement.' The Court wrote:
 "`The evidence shows that the defendant was the station agent of the Railway Company, and as such had full charge and control of its business at that station; was the custodian of all money arising out of the sale of tickets, collected all freight and express charges, made disbursements, and kept the books. Furthermore, the evidence tended to show that by a system of false entries upon the books, and other dubious practices, he endeavored to conceal his withholding of small sums of money which came into his possession from time to time by virtue of his employment. And by a system of falsification he managed to conceal for a considerable length of time his acts of conversion of his employer's money. The tendency of the evidence strongly supports the theory that the defendant systematically instituted a continuous series of withholding of his principal's money for the purpose of acquiring for his own use, ultimately, a large sum. Where this is the case, the doctrine of election does not apply, since the series of acts would constitute but one offense and each separate act would not be separate and distinct offenses.'
 "The same can be said of the instant case. The appellant's theft of funds from Goodwill Industries was systematic and constituted a continuous series of actions."
565 So.2d at 1282.
Here, Greer's actions were alleged in the indictment to be part of one ongoing scheme or plan, i.e., "hiring the said Webster to work in their district" (C. 5), and the case was argued to the jury as such. Thus, election was not required.
Greer also argues that he was "deprived of a unanimous verdict" (Greer's brief at p. 46) because, he argues, some jurors may have believed that he was guilty with regard to one project while others may have believed that he was guilty with regard to a different project, resulting in a less than unanimous verdict that he was guilty with regard to the same project. The record reflects that Webster's attorney raised the issue of a unanimity instruction, and the prosecutor responded that he would not object to such an instruction.[12] Greer joined in Webster's argument regarding a unanimity instruction; *Page 474 
however, none of the defendants objected to the trial court's jury instructions, which did not include a unanimity instruction. Therefore, Greer's argument regarding the unanimity instruction was not preserved for our review. See Rule 21.3, Ala.R.Crim.P.
As for Greer's contention that the trial court should not have submitted both counts one and two of the indictment to the jury, we note that § 13A-1-8(b), Ala. Code 1975, states that "[w]hen the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each suchoffense." (Emphasis added.) See Borden v. State,711 So.2d 498, 503 (Ala.Crim.App. 1997), aff'd 711 So.2d 506, (Ala. 1998) ("We recognize that the trial court may, and indeed should, properly submit to the jury all counts of an indictment and lesser included offenses reasonably supported by the evidence. . . .").
However, § 13A-1-8(b) also provides that a defendant "may not . . . be convicted of more than one offense if . . . [t]he offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct." In that situation, where the jury returns guilty verdicts for both offenses, the trial court should enter a judgment on only one of the offenses. See Borden, 711 So.2d at 503. We note that Greer argued at trial that the trial court could not punish him twice if he were convicted under both counts one and two. We need not decide whether that argument was sufficient to preserve for appellate review Greer's argument that it was error for him to be convicted under both counts one and two. This Court has held that § 13A-1-8(b) implicates the jurisdiction of the trial court and that convictions entered in contravention of that provision must be noticed by this Court regardless of whether they were challenged below. See Straughnv. State, 876 So.2d 492, (Ala.Crim.App. 2003), and the cases cited therein.
Section 36-25-5(a), which formed the basis for Greer's conviction under count one, prohibits a public official from using, or causing to be used, his official position or office to obtain personal gain for himself. That section states that "[p]ersonal gain is achieved when the public official . . . receives, obtains, exacts control over, or otherwise converts to personal use the object constituting such personal gain." Section36-25-7(b), which formed the basis for Greer's conviction under count two, prohibits a public official from soliciting or receiving a thing of value for himself for the purpose of influencing official action. Section 36-25-5(a) codifies an offense defined to prohibit a designated kind of conduct generally — the use of an official position or office for personal gain. The manner of obtaining personal gain is not specified. Section 36-25-7(b) codifies an offense defined to prohibit a specific manner in which a public official may use his office or position to obtain personal gain — soliciting or receiving a thing of value for the purpose of influencing official action. Here, Greer was convicted of using his position or office in order to obtain monetary payments from Webster and of soliciting or receiving monetary payments from Webster in exchange for hiring Webster Construction Company to do work for the County. We conclude that this is exactly the situation proscribed by § 13A-1-8(b), and, therefore, that convictions under both counts one and two are not authorized.
For the foregoing reasons, we affirm Webster's convictions and sentences under counts one and three of the indictment, and Stewart's conviction and sentence under count one of the indictment. However, *Page 475 
because it was improper to convict Greer under both counts one and two of the indictment, one of those convictions must be vacated. There is no discernable difference between Greer's two convictions — both are Class B felonies, see § 36-25-27(a)(1), Ala. Code 1975, and Greer received the same sentence, five years' imprisonment, for each — so we leave it to the discretion of the trial court, with input from the parties, as to which conviction should be vacated. Therefore, we remand this cause for the trial court to vacate one of Greer's convictions. The trial court shall inform this Court which conviction was vacated within 35 days from the date of this opinion.
AFFIRMED IN PART AND REMANDED WITH DIRECTIONS.*
COBB and BASCHAB, JJ., concur. McMILLAN, P.J., and WISE, J., recuse themselves.
[1] Stewart and Greer were also indicted for a second count of using their official position or office for personal gain, along with Pam Gilmore, county administrator for Marshall County. Stewart and Greer were convicted of this second count; Gilmore was acquitted. The trial court set aside Stewart's and Greer's convictions on that count after the trial. Webster, Stewart, Greer, and Gilmore were tried together.
[2] Sims defeated Greer in the election, who had been elected county commissioner for district three in 1987.
[3] Before the change in the law, county commissioners were subject to § 41-16-20, Ala. Code 1975, and could award a contract without soliciting bids only if the contract was under $7,500. The amendment to § 39-2-1 et seq., Ala. Code 1975, made that code provision applicable to counties.
[4] Sims stated that he had 21 state felony charges against him, none of which involved the ethics violations in this case, and he pleaded guilty to two counts and received five years' probation. In exchange for his testimony, the remainder of the charges were dismissed, the State agreed not to bring any charges against him with respect to the ethics violations in this case, and the State agreed not to charge his wife and son, who had been implicated in some of the charges. In addition, he had been convicted of a wiretapping charge in federal court and received three years' probation.
[5] The record reflects that some of the checks were made payable to Webster Construction Company, and that some of the checks were made payable to Maurice Webster, doing business as Webster Construction Company.
[6] Sims testified as follows:
 "[Prosecutor]: When you were working with Mr. Webster and had your arrangement with Mr. Webster, did he describe that he had a particular way in dealing with the county?
 "[Sims]: Well, that's the way he dealt with the county is — the way that we did the projects was the way he dealt with the county.
"[Prosecutor]: That's what Mr. Webster told you?
"[Sims]: Yes, sir.
 "[Prosecutor]: So he told you that the way he did work with the county was to set a price and then share any over that with the commissioner?
"[Sims]: Yes, sir."
(R. 134.)
[7] Oliver testified in part as follows:
 "[Prosecutor]: Before they showed up, were the county employees always able to do the work on projects?
"[Oliver]: Yes, sir.
 "[Prosecutor]: Had anything happened in your district to cause you to need extra help on a project?
 "[Oliver]: Not as I know of, you know. The dozers were pretty old and everything, but as far as that, I don't know of nothing.
 "[Prosecutor]: There's other shops in Marshall County, right?
"[Oliver]: Yes, sir.
 "[Prosecutor]: Have you ever had an occasion to borrow a piece of equipment if you needed to?
"[Oliver]: Yes, sir.
 "[Prosecutor]: If you needed extra men, could you borrow extra men?
"[Oliver]: Yes, sir.
 "[Prosecutor]: Did you ever notice that Mr. Webster and Mr. Runyans had any special expertise or anything like that?
"[Oliver]: No more than we did.
 "[Prosecutor]: Could they do anything that you couldn't do?
"[Oliver]: No, sir.
 "[Prosecutor]: Now, did they have any equipment that Marshall County didn't have?
"[Oliver]: Yes, sir, a track hoe.
 "[Prosecutor]: Were there any jobs where you had to have a track hoe or you couldn't do the job without a track hoe?
 "[Oliver]: Well, you could do it, but it would probably take you a little longer.
"[Prosecutor]: It could be done.
"[Oliver]: It could be done, yeah."
(R. 384-85.)
[8] We note that there is a split of authority as to whether the uncorroborated testimony of an accomplice is sufficient to establish the corpus delicti of a felony. See 23 C.J.S. CriminalLaw, § 1015(c) (1989). The rule in Alabama is that while the uncorroborated testimony of an accomplice is not sufficient to support a felony conviction, the corpus delicti may be proved by the uncorroborated testimony of an accomplice. Stated differently, an accomplice's testimony requires no corroboration to be considered as evidence that a crime was committed by someone. See C. Gamble, McElroy's Alabama Evidence, § 300.01(4) (5th ed. 1996), citing Smith v. State, 59 Ala. 104 (1877). InSmith, the Alabama Supreme Court construed § 4895 of the 1876 Code, the predecessor to § 12-21-222, as requiring corroboration of only that part of the accomplice's testimony that incriminates the defendant. The Court stated:
 "The evidence of the witness, Nicholson, [which consisted mainly of the defendant's confession,] did tend to connect the prisoner with the commission of the offence, and thus fairly presented to the jury the credibility of the accomplice. The statute does not specify any other fact, testified to by an accomplice, which requires corroboration before it will authorize conviction, and we are not authorized to add other clauses to it. The corroboration, extending to this essential, the question of guilt or innocence should be allowed to be passed on by the jury."
59 Ala. at 105 (emphasis added). See also Dykes v. State,30 Ala.App. 129, 1 So.2d 754 (1941). Therefore, we conclude that Sims's testimony, standing alone, was sufficient to establish that illegal payments had been made to county commissioners other than Sims.
[9] In addition to the issues raised in his initial brief, Stewart, citing Rule 28(i), Ala.R.App.P., stated in his reply brief that he adopted by reference "the arguments of Bill Greer and Maurice Webster set forth in their initial briefs and reply briefs, which are applicable to him." (Stewart's reply brief, at p. 19.) To the extent that Stewart intended to raise new issues for the first time in his reply brief, we note that such issues are not considered by this court. See Woods v. State,845 So.2d 843, 846 (Ala.Crim.App. 2002) ("[A]n appellant may not raise a new issue for the first time in a reply brief.").
[10] We note that § 36-25-27(c) states in part: "The enforcement of this chapter shall be vested in the commission;provided however, nothing in this chapter shall be deemed tolimit or otherwise prohibit the Attorney General or the districtattorney for the appropriate jurisdiction from enforcing anyprovision of this chapter as they deem appropriate." (Emphasis added.) The investigation in this case was initiated by the attorney general, not by the Ethics Commission. See Ex parteE.J.M., 829 So.2d 105 (Ala. 2001).
[11] We note, conversely, that § 36-25-5(a), (c), and (e), and § 36-25-7(b) and (d) all proscribe activities by the applicable public employee or public official or family member of the applicable public employee or public official, or both.
[12] The prosecutor later stated that the State had alleged the actions as one scheme, and that it might not have an objection to a unanimity instruction.
* Note from the reporter of decisions: On November 19, 2004, on return to remand, the Court of Criminal Appeals affirmed as to defendant Greer, without opinion.