900 So.2d 475 (2004)
Ex parte Mike STEWART.
(In re Maurice Ray Webster, Mike Stewart, and Bill Greer
v.
State of Alabama).
1031360.
Supreme Court of Alabama.
November 19, 2004.
*476 Charles H. Pullen, Huntsville, for petitioner.
Troy King, atty. gen., and Michael B. Billingsley and Stephanie N. Morman, asst. attys. gen., for respondent.
BROWN, Justice.
Mike Stewart, a former county commissioner for Marshall County, was convicted, along with Maurice Ray Webster and another former county commissioner, Bill Greer, of violating the State ethics law, Ala.Code 1975, § 36-25-1 et seq. Specifically, a jury found Stewart guilty of intentionally using his official position to unlawfully obtain personal gain by hiring Webster, a contractor, to perform road-construction work in his district in return for monetary payments from Webster, in violation of Ala.Code 1975, § 36-25-5. The trial court sentenced Stewart to five years' imprisonment and ordered him to pay a $1,000 fine.
On March 26, 2004, the Court of Criminal Appeals affirmed Stewart's, Webster's, and Greer's convictions. Webster v. State, 900 So.2d 460 (Ala.Crim.App.2004). On August 25, 2004, we granted Stewart's petition for certiorari review to determine whether the Court of Criminal Appeals erred in holding that the State had produced the corroborating evidence required by Ala.Code 1975, XX-XX-XXX.[1] We reverse the judgment of the Court of Criminal Appeals and render a judgment of acquittal for Stewart.

Facts and Procedural History
Stewart and Greer, also a former county commissioner for Marshall County, were convicted of violating the ethics law by using their positions as county commissioners to hire Webster to perform road-construction work in their respective districts in return for Webster's paying them a portion of the profit he made on the work. Webster was convicted of offering things of value for the purpose of influencing official action, a violation of Ala.Code 1975, § 36-25-7(a), and, as an accomplice, of using an official position or office for personal gain, a violation of Ala.Code 1975, § 36-25-5(a). The three men were tried together; the Court of Criminal Appeals consolidated their appeals and upheld their convictions. Webster, supra.

Standard of Review
The Court of Criminal Appeals correctly stated the standard of review in this case:
"Initially, we note that `"[i]n determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and *477 consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So.2d 1033, 1034 (Ala. Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala.1985). `"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala. Crim.App.1992). `"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision."' Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala. Crim.App.1990). `The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978)."
Webster, 900 So.2d at 463.

Analysis
In rejecting Stewart's argument that his conviction was based on the uncorroborated accomplice testimony of Elton Sims, who was also a former county commissioner for Marshall County, the Court of Criminal Appeals found that the corroborating evidence offered by the State was "minimally sufficient" under Alabama law to allow submission to the jury of the charge against Stewart. 900 So.2d at 468. We disagree.
Alabama Code 1975, § 12-21-222, provides: "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
"The Court of Criminal Appeals, explaining [§ 12-21-222], has written:
"`The formula applying the rule requires that evidence of the accomplice must first be "subtracted" and then, if upon the review of all other evidence before the court at the time of the motion, there is found to be sufficient incriminating evidence which would tend to connect the defendant with the commission of the offense, sufficient corroboration exists. Craig v. State, [376 So.2d 803, (Ala.Crim.App.), writ denied, 376 So.2d 807 (Ala.1979)]; Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). However, the corroborative evidence need not refer to any statement or fact testified to by the accomplice. Neither must it be strong [or] sufficient of itself to support a conviction. The probative value of the evidence need only legitimately tend to connect the accused with the crime and need not directly do so. Further, corroborative evidence need not directly confirm any particular fact [or] affirm each and every material fact testified to by the accomplice. Corroboration may be proven by circumstantial evidence alone. Craig, supra.'

"Mills v. State, 408 So.2d 187, 191 (Ala.Crim.App.1981).
"The Court of Criminal Appeals has also added the following caveats to the rule:

*478 "`"The tendency of the corroborative evidence to connect [the] accused with the crime, or with the commission thereof, must be independent, and without the aid, of any testimony of the accomplice; the corroborative evidence may not depend for its weight and probative value on the testimony of the accomplice, and it is insufficient if it tends to connect [the] accused with the offense only when given direction or interpreted by, and read in conjunction with, the testimony of the accomplice." 23 C.J.S. Criminal Law, Section 812(b) (1961).'

"Mills v. State, 408 So.2d at 191-92."
"`"`[E]vidence which merely raises a conjecture, surmise, speculation, or suspicion that [the] accused is the guilty person is not ... sufficiently corroborative of the testimony of an accomplice to warrant a conviction.' 23 C.J.S. Criminal Law, Section 812(5)(b)." Staton v. State, 397 So.2d 227, 232 (Ala.Crim.App.1981).'

"Steele v. State, 512 So.2d 142, 143-44 (Ala.Crim.App.1987)."
Ex parte Hunt, 744 So.2d 851, 858-59 (Ala. 1999).
Sims, the accomplice in this case, testified at trial pursuant to a plea agreement that provided that in exchange for testifying he would plead guilty to two felony charges and be placed on five years' probation. At trial, Sims testified that Greer suggested that Sims use Webster's business, Webster Construction Company, to complete road projects in Sims's district. Greer told Sims that he "could probably do a little better with Mr. Webster than ... with the other contractors" and that when he made that statement Greer rubbed his fingers together, which Sims understood to mean that he could receive some "monetary value" if he used Webster's business for road projects in his district.
Sims soon began using Webster Construction Company on road projects in his district. Sims testified that he and Webster would set a price on the project and "then anything above the price that we set that the purchase order was made for, I would get 50 percent above that and he would keep 50 percent above that."
According to Sims, on one occasion he and Greer paid Webster for a nonexistent road-construction project. Sims testified that he submitted a requisition and work order for the nonexistent project and that he had the County issue a $3,000 check made payable to Webster, although Webster actually did no work for the money. Sims testified that he, Webster, and Greer then split the $3,000.
Sims also testified that, after he had used Webster Construction Company for road-construction projects in his district for a period of time, Greer approached him and told him to start using the name Bill Runyans instead of Webster on requisition orders, because Webster's name had appeared too often in the County's computer records. Sims thus began using the name Runyans, but the projects were still being completed by Webster Construction Company and the money for the projects was still being paid to Webster.
Sims's testimony never directly implicated Stewart in the payment scheme involving Sims, Greer, and Webster. As the Court of Criminal Appeals noted:
"Sims testified that at one point he was present when Greer told Stewart that he should use Webster Construction Company for his projects. Sims stated that at no point during that conversation did Greer tell Stewart that he could receive money for using Webster Construction Company, but that Webster had told [Sims] at some point that the *479 arrangement he had with Sims `was the way he dealt with the county,' i.e., that he would set a price and then share with the commissioner whatever profit he made over that price. . . . Sims testified that he had no knowledge of Stewart's ever receiving any money from Webster for any road projects done in Stewart's district, and that Stewart had never told him that he had received money from Webster."
Webster, 900 So.2d at 464-65 (footnote omitted). Moreover, at trial, Sims was asked the following questions:
"[Defense counsel:] You didn't testify anything about Mike Stewart getting any kickbacks, bribes, payoffs from Maurice Webster did you? You didn't give any testimony to that effect did you?
"[Sims:] No, sir, I didn't.
"[Defense counsel:] All right. And you've testified before the grand jury that you never had any conversation with Mike Stewart about that, that he never said anything to indicate he was getting any kind of kickback, financial kickback?
"[Sims:] No, sir, he didn't. Not to me he didn't. Not to my knowledge.
"[Defense counsel:] You don't know anything about that do you?
"[Sims:] No, sir, I don't.
"[Defense counsel:] You understand I represent Mike Stewart. That's all I'm interested in. You don't know anything about Mike Stewart in that regard; is that correct?
"[Sims:] That's correct."
Sims also testified about a conversation between Greer, Stewart, and himself. In that conversation, Stewart asked Sims and Greer about using Webster's construction services:
"[Defense counsel:] And that was when they were first talking about, you said Stewart was asking about using Mr. Webster?
"[Sims:] Yes, sir.
"[Defense counsel:] Greer didn't say anything at all in that conversation about him getting any money back, did he?
"[Sims:] No, sir.
"[Defense counsel:] As a matter of fact, he made it very clear that there wasn't no money [sic], it was for the work, didn't he in that conversation?
"[Sims:] I believe he did. I'm pretty sure he did, sir."
While Sims's testimony tends to establish that he, Greer, and Webster had engaged in a scheme to award road-construction projects and then to receive money from the contractor for doing so, Sims's testimony does not appear to establish that Stewart was in any way guilty of that wrongdoing.
To corroborate Sims's testimony, the State presented evidence of Marshall County's normal procedure for requesting bids from and paying outside vendors. Mary Susan McCormick, an accountant for the County, testified that a commissioner who wants to make a purchase for or have work performed in his district first submits a purchase requisition. Once the purchase or work is completed, the vendor mails an invoice to the County for the purchase or the work performed; the County then issues a computer-generated check payable to the vendor and mails the check to the vendor as payment. McCormick testified, however, that she issued several checks for Sims and Greer by using a typewriter rather than the computer, even though the County officials did not like to issue typewritten, as opposed to computer-generated, checks. According to McCormick, most of the checks she had *480 typewritten for Sims and Greer were payable to Webster Construction Company, and Sims and Greer would personally deliver an invoice from Webster Construction Company and request that she immediately issue a check for the amount of the invoice. Only once did Stewart ask McCormick to type a check; it was a check made out to Webster Construction Company and it is undisputed that the check replaced a computer-generated check previously sent to Webster Construction Company that had apparently been lost in the mail. McCormick further testified that the payments to Webster on the sole project for which Stewart used Webster Construction Companythe Saylor's Gap Road projectwere made in "the correct way." While McCormick's testimony tends to prove that Sims and Greer bypassed the normal procedures in securing checks used to pay Webster, it does not tend to establish that Stewart engaged in any unusual activity with regard to the County's check-writing procedures nor does it otherwise corroborate an inference, if any could be formed, from Sims's testimony that Stewart was involved in a scheme to inflate the cost of road projects and share in the profits.
The State also presented as corroborative evidence testimony regarding four construction projects on which Webster Construction Company had performed the work. As the Court of Criminal Appeals notes, the State presented testimony from an engineer for Marshall County, as well as an engineer employed with the Alabama Department of Transportation. Those engineers testified that the cost of the four projects, including the Saylor's Gap Road project, should have been less than what Webster Construction Company charged the County for those projects. However, on cross-examination, the engineer for Marshall County revealed that, insofar as his testimony regarding the Saylor's Gap Road project was concerned, the equipment-rental rate schedule upon which he based his estimate of the cost of the project was over five years old at the time he made his estimate and was no longer accurate. Moreover, the engineer had failed to include the costs associated with work performed on Guntersville Dam Road, which was part of the Saylor's Gap Road project. Finally, all of the estimates provided by the engineers differed, and none took into account a profit for the contractor. Thus, the State's evidence regarding the actual cost of the Saylor's Gap Road project was, at best, incomplete.
The Court of Criminal Appeals also noted that the State presented as corroborating evidence the testimony of several County employees:
"The State also presented testimony from various county employees regarding [the construction projects involving Webster], which indicated that, although Webster Construction Company had been hired to do the projects, county employees actually did a large portion of the work. This testimony also indicated that Webster Construction Company had done a good job on all of the projects, but that it had not done anything that county employees could not have done themselves, although it would have taken longer to complete the projects without the help of Webster Construction Company. One county employee, Lynn Waldrop, a former road foreman for district one in Marshall County [the district Stewart represented], testified that during the Saylor's Gap Road project Webster Construction Company was hired to load chert at a local chert pit. When asked how many times in the past he had needed assistance in loading chert at the pit, Waldrop testified: `Well, that's actually the only time they hired anybody.'"
*481 Webster, 900 So.2d at 466. Waldrop also testified, however, that the Saylor's Gap Road project needed to be completed quickly to take advantage of the cold weather favorable to the paving process. Waldrop testified that to complete the process in a timely manner an outside contractor was needed. Moreover, accordingly to Waldrop, Webster's crew worked longer hours and more quickly than did the County workers. Additionally, Waldrop testified that Webster Construction Company's equipment was used to load chert at the chert pit because the County's bulldozer was not functioning when the chert needed to be loaded.[2] Finally, Waldrop testified that at the time he noticed nothing suspicious in having an outside contractor perform the work at the Saylor's Gap Road project.
Based on the evidence before us, we conclude that Sims's testimony failed to establish that Stewart violated the State ethics law. Instead, Sims was unequivocal in his statement that he had no knowledge whatsoever of any participation by Stewart in the scheme in which Sims, Greer, and Webster were participating. However, even if this Court were to conclude that Sims's testimony implicated Stewart in the scheme to funnel work to Webster in return for a payment, as the Court of Criminal Appeals found, based on the foregoing we hold that the evidence corroborating Sims's testimony was insufficient under Ala.Code 1975, § 12-21-222. The corroborating evidence in this case did not tend to connect Stewart with the criminal activity that occurred in this case. See Hunt, supra. The Court of Criminal Appeals erred in affirming Stewart's conviction. We therefore reverse the judgment of the Court of Criminal Appeals and render a judgment of acquittal in favor of Stewart.
REVERSED AND JUDGMENT RENDERED.
NABERS, C.J., and SEE, HARWOOD, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., concurs specially.
HOUSTON and LYONS, JJ., concur in the result.
JOHNSTONE, Justice (concurring specially).
I concur fully in the main opinion. I write specially only to add that, even absent the application of § 12-21-222, Ala. Code 1975, the State failed to prove a prima facie case against the defendant Stewart.
LYONS, Justice (concurring in the result).
Because I do not consider the State's evidence, as set forth below, sufficient to support Stewart's conviction, I concur in the result.
According to the evidence, Commissioners Bill Greer and Elton Sims had done business with Webster Construction Company, and Maurice Webster had paid each of them a percentage of the profits resulting from that business. Sims testified that Greer, in his presence, told Stewart that, "he (Greer) always got Mr. Webster and took him out to his projects and let him see what needed to be done and come up with a price." This testimony, standing alone, is not sufficient to establish any wrongdoing on Stewart's part. Further, there is nothing in Sims's account of Greer's statement to Stewart about Greer's receiving a kickback after Webster *482 was awarded the contract. Perhaps Greer did not want Stewart to know about his illegal acts.
The only contact involving Webster and Stewart took place after several transactions between Webster and Sims, on the one hand, and Webster and Greer, on the other, had taken place. Sims also testified that Webster told him that the way Webster "dealt with the County" was to set a price and then share any profit over that price with the commissioner who had gotten them the job. What is meant by "the County?" Nothing in Sims's testimony regarding Webster's description of the way he did business with the County indicates when Webster made the statements. For all that appears, Webster commented about setting a price and sharing the overage when he did business with "the County" before the lone transaction between Webster and Stewart and thus was referring in that comment to those transactions involving only Commissioners Sims and Greer. In order to affirm Stewart's conviction, I would have to make the double assumptions (1) that this conversation took place after the lone transaction between Webster and Stewart and (2) that that transaction, like those with Commissioners Sims and Greer, involved a payment by Webster to Stewart. Permitting the jury to make those assumptions was error because this evidence against Stewart did not sufficiently satisfy the State's burden of proof.
HOUSTON, J., concurs.
NOTES
[1] Webster and Greer filed separate petitions for the writ of certiorari. On August 13, 2004, this Court denied Webster's petition (case no. 1031357) and Greer's petition (case no. 1031369), both without an opinion.
[2] Waldrop testified that the County's bulldozer, which was a military-surplus model, was out of commission for "quite some time" because it was more difficult to repair than a commercial model.