Rel: May 2, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

_____

## CR-2024-0086

_____

## J.M.M.

## v.

## State of Alabama

## Appeal from Russell Circuit Court
## (CC-2020-755)

_____

## CR-2024-0157

_____

## A.E.M.

## v.

## State of Alabama

## Appeal from Russell Circuit Court
## (CC-2020-754)

KELLUM, Judge.

J.M.M. and A.E.M., husband and wife, appeal their convictions for the aggravated child abuse of 18-month-old B.N., their foster child, violations of § 26-15-3.1(b)(1), Ala. Code 1975.[1] The Russell Circuit Court sentenced each defendant to life in prison. These appeals followed.

The State's evidence tended to show that on August 22, 2020, emergency personnel were dispatched to an address on Old Glory Way at Fort Mitchell in response to an emergency 911 call that a child had slipped in the tub. Kevin Hagberg, a deputy with the Russell County Sheriff's Office, testified that when he arrived at the house emergency personnel were transporting B.N. to Piedmont Columbus Regional Hospital. Deputy Hagberg followed the ambulance to the hospital. According to Deputy Hagberg, when he arrived at the hospital B.N. was awake but did not speak, and had multiple bruises on her front and back and around her neck. Based on the severity of the injuries, B.N. was transported to Children's Hospital in Birmingham.

---

[1]The defendants were tried jointly. They filed separate notices of appeal to this Court. Because the two defendants were tried together, we have consolidated their appeals.

Heidi Grohman, the program manager for the Russell County Department of Human Resources ("DHR"), testified that she met B.N. when B.N. entered the foster-care system in 2019 at the age of four or five months old. (Supp. R. 175.)[2] In January 2020, B.N. was sent to J.M.M. and A.E.M.'s home for seven days while B.N.'s foster parents had a respite. (Supp. R. 180.) She was placed in J.M.M. and A.E.M.'s home on a more permanent basis in May 2020, when she was about 15 months old. (Supp. R. 184.) Grohman testified that J.M.M. and A.E.M. "expressed some frustrations" with B.N. (Supp. R. 194.) She testified: "There were actually a total of four specific allegations [against the defendants]. Under the category of physical abuse, the ones that we indicated were for cuts and bruises, internal injuries, broken bones, and the other one is called bizarre discipline or confinement." (Supp. R. 202-03.)

The social worker assigned to B.N.'s case, Evelyn Bonilla, testified that B.N. had no trouble with the family that she had lived with before she lived with the defendants. After B.N. was placed with A.E.M. and

---

[2]The 10-volume supplemental record contains the corrected transcript of the trial proceedings. The other documents are contained in the original record that was filed in this Court.

J.M.M., she said, A.E.M. would frequently communicate with Bonilla concerning B.N. On May 21, 2020, A.E.M. sent Bonilla a picture of B.N. that showed marks on B.N.'s forehead. (R. 586.) Bonilla explained that A.E.M. told her that the marks occurred when B.N. was fighting over toys with the other children. On August 17, 2020, Bonilla visited B.N. to check on her.

> "[Bonilla]: On the 17th [B.N.] did not look well. She looked very exhausted, very weak. She looked like she hadn't eaten. She just didn't look fine. She was just kind of there.
>
> "[Prosecutor]: She was just kind of there. What do you mean by that?
>
> "[Bonilla]: Kind of blanked out, and not usually the [B.N.] that she usually is. She was just kind of like on the standstill. She wasn't playing. She wasn't smiling. She wasn't really doing anything that she normally used to do. She looked a little skinnier. She just -- she -- wasn't the [B.N.] that I was used to seeing.
>
> "[Prosecutor]: Was there anything about her face that you noticed?
>
> "[Bonilla]: She had a couple of bruises on her face. I don't remember her -- I don't remember exactly what she was wearing, but I do remember she had a couple of bruises on her face.
>
> "[Prosecutor]: Did you do anything after your visit with [B.N.] on the 17th?
>
> "[Bonilla]: Yes.

4

"[Prosecutor]:  What did you do?

"[Bonilla]:  I went, and I had a meeting with my supervisor.

"....

"[Prosecutor]:  And when you met with [your supervisor], what was it you were talking to [her] about?

"[Bonilla]:  Just about my concerns.  About how I felt like something was off.  I felt something was wrong.  And I asked her if she could place some eyes because nobody wants to see a child like that, nobody.  And it's a little more personal when you're with these kids for so many months and you see them going through all these different changes.  …

"....

"[Bonilla]:  I also spoke with other members of my staff.  I contacted the doctor -- [B.N.] had an appointment the next day -- so that she could put eyes on her as well. …

"....

"[Bonilla]:  The doctor called me back and told me that she didn't really have -- she said that she saw the bruises and stuff.  She said that -- I asked her if [B.N.] needed to be removed from the home immediately, and she told me, no, but she just didn't see [B.N.] thriving there long-term, and there would have to be a -- like something for it to happen eventually."

(Supp. R. 669-674.)  Five days later, on August 22, A.E.M. called Bonilla and said that she was going with B.N. to the hospital.  Bonilla testified:

"[A.E.M.] was hysterical.  She was telling me that [B.N.] had been so

weak that they couldn't get her in, kind of, be responsive. She put her in the tub, and she fell over and hit her head in the tub. She either slipped on water or something, and that they had to call the ambulance, and that the ambulance was on the way there." (Supp. R. 675.) Bonilla said that the next morning she saw B.N. at the hospital and that B.N. was so weak she could not lift her head to eat. (Supp. R. 677.) After B.N. got out of the hospital she was placed with a different foster family. (Supp. R. 681.)

Dr. Rebecca Reamy, Chief of Pediatrics at Piedmont Columbus Regional Hospital, testified that she is a pediatric emergency physician and was working in the emergency room when B.N. was admitted on August 22. (Supp. R. 722.) She said that B.N. was brought by ambulance, that she had an "altered mental status," that her breathing was slow, and that she was covered in bruises. (Supp. R. 724.) Dr. Reamy said that they gave B.N. fluids and conducted more extensive tests. Bonilla said that she spoke to J.M.M. and that he told her "that [B.N.] was sitting in the highchair, and her eyes got glazed, and so he gave her some juice because, when that happened on Thursday it perked her up." (Supp. R. 731.) Dr. Reamy said that she asked J.M.M. about the numerous bruises on B.N.'s body and that he said "that she didn't walk

6

very well, that he had to drag her up and down the stairs, that she didn't like to take a bath, so they had to hold her in the bathtub. He said, she was a pain in my butt." (Supp. R. 732.) J.M.M. also told Dr. Reamy that he had bought B.N. a "helmet on Thursday to protect her dome. …" (Supp. R. 734.)

Dr. Reamy testified that none of what J.M.M. told her about B.N.'s injuries corresponded to her observation of B.N.'s injuries. (Supp. R. 734.) Dr. Reamy specifically testified as follows:

> "[Prosecutor]: Is there anything different about that [photograph of B.N.] that you would like to point out?
>
> "[Dr. Reamy]: Just lots more bruises. Again, you can see the one on her forehead, and then several on her cheek, her ear, and this really disturbing one on her neck.
>
> "[Prosecutor]: Why do you say it's disturbing?
>
> "[Dr. Reamy]: Because the only way that her injury could have occurred was for it to be inflicted."

(R. 737.) She said that B.N. had spots on her head where her hair had been pulled, that she had 7 bald spots where her hair had been pulled out, that she had numerous bruises on her arms and hands, that she had bruises on her chest, that some bruises were already yellowing, that she had 14 bruises on her legs and feet, and that the bruising on B.N.'s body

7

was not typical for a toddler. (Supp. R. 738-42.) Dr. Reamy testified that when she first saw B.N. she was "horrified" and that in her 30 years of experience she had never seen a "worse case of non-fatal abuse." (Supp. R. 742-43.) She diagnosed B.N. with the following injuries: "Subdural hematoma, closed non-depressed fracture of the skull, initial encounter, and battered child syndrome." (Supp. R. 744.) B.N. did not receive all of her injuries on August 22, Dr. Reamy said. (Supp. R. 745.)

Dr. Melissa Peters testified that she was an emergency-room physician at Children's Hospital and that she specialized in child-abuse cases. She testified that she saw B.N. when she was transferred from Piedmont Columbus Regional Hospital to Children's Hospital. Dr. Peters discussed her examination of B.N. and detailed the numerous injuries that covered most of B.N.'s body. Dr. Peters testified that B.N. had a brain injury, that she had a subdural hemorrhage, and that she had a fracture at the base of her skull. (Supp. R. 366; 391; 403.) When B.N. arrived at Children's Hospital, she was hypothermic -- her body temperature was 94 degrees. (Supp. R. 408.) She said that B.N. had two bones that had recently been broken -- her left femur and left radius --

and that those injuries could not have occurred before May 18, 2020.

(Supp. R. 423.)

> "[Prosecutor]: With regard to household falls, and, that is, when a toddler normally toddles around the house and falls, falling into the wall and hits their head, would you expect to see the injuries that you witnessed and have testified to?
>
> "[Dr. Peters]: Not all of these injuries. Not in the constellation that we saw. No."

(Supp. R. 435.) Dr. Peters said that B.N.'s injuries were life threatening unless treated. (R. 448.)

J.M. testified that he is J.M.M.'s and A.E.M.'s 12-year-old son. He testified to what he remembered about the night that B.N. was taken to the hospital:

> "[Prosecutor]: So you said you and [your brother] were in another room with the pets watching a movie, and your parents -- where were they?
>
> "[J.M.]: In the bathroom.
>
> "....
>
> "[Prosecutor]: Did you hear anything?
>
> "[J.M.]: Yes. I heard a big bang. I heard something like a big bang, and then that's when I heard some crying. That's when -- that's when [A.E.M.] came out dialing 9-1-1."

(Supp. R. 775-76.) L.M., J.M.'s 10-year-old brother, testified that on the day B.N. was taken to the hospital B.N. was screaming and crying.

Lynn Hammock, Director of the Russell County Child Advocacy Center, testified that she conducted extensive forensic interviews with both J.M. and L.M. She testified that L.M. told her that his mother, A.E.M., told him not to talk to DHR or to say anything about what happened at their home. (Supp. R. 955.) L.M. also told her that B.N. "did receive hits" from his mom and dad. (Supp. R. 956.) Hammock said that J.M. also told her that he was told not to talk to DHR.

M.Mc. testified that DHR placed B.N. with his family after she was released from the hospital and that he and his wife later adopted B.N. (Supp. R. 1229.) He testified that they had no trouble with B.N., that they had no trouble feeding her, and that she did not bang her head into walls. B.Mc., M.Mc.'s wife, testified that B.N. still struggles: "She started preschool this year, and we're starting to see some issues. She struggles in school. She struggles paying attention, those types of things." (Supp. R. 1255.) B.Mc. further testified that B.N. was to be evaluated for frontal-lobe damage because of her problems in school caused by memory lapses and her failure to identify colors and shapes.

Numerous pages of text messages exchanged between J.M.M. and A.E.M. were admitted into evidence. (C. 800-1563; C. 1712-1828.) A great deal of their discussions concerned their dislike of B.N. In one conversation, A.E.M. texted J.M.M.: "O.k. well let's not get all physical with them. That's not correcting a behavior with the right attitude, we have gone way too far with [B.N.] and now things are escalating living with the boys. I don't want to be one of those parents." (C. 1441-42.) In another discussion, they talked about how to get rid of bruises and mentioned the bruises on B.N.'s body. A.E.M. texted: "She's got a lot of bruises on her face and her chin, we have to stop doing everything. She doesn't eat fine. Go to bed." (C. 1432.) In another discussion, A.E.M. texted: "As soon as the bruises are gone, if they call with a newborn or other placement I will say yes but [B.N.] needs to go." (C. 1434.) J.M.M. responded: "O.k. sounds good," "Sorry that prob. mostly my fault." (C. 1434.) A.E.M. responded: "It was both of us." (C. 1434.) On August 20, A.E.M. texted J.M.M.: "If she stays much longer I might kill her … I'm not kidding." (R. 1483.)

J.M.M. testified in his own defense and said that he had been in the Army since he was 18 years old and that, in 2018, they began living at

11

Fort Mitchell in Russell County. He said that when he and A.E.M. were foster parents to B.N. they had one other foster child and their two sons in the home. He admitted that in the text exchanges he referred to B.N. in a derogatory manner on 19 occasions and that he often expressed frustrations about B.N. (Supp. R. 1732.) J.M.M. testified that he had spanked B.N.

A.E.M. also testified in her own defense. A.E.M. said that she and J.M.M. had been foster parents while they lived in California and that they had fostered five children while in California before moving to Alabama. In Alabama, she said, a foster child was placed in their home in February 2018, and, until B.N. came to their home in May 2020, they had never had any complaints. (Supp. R. 1324.) She testified concerning J.M.M.'s contact with B.N.:

> "[T]owards the end of July and through August when [B.N.] was having difficulties and taking longer to eat, he would wash the dishes and then he would typically bathe her or clean her up after. And then he would get her drink ready for bed and then he would take her to bed while I had the other three kids upstairs getting them ready for bed."

(Supp. R. 1333-34.) She said that J.M.M. was home more the first part of August 2020 because he was in the process of "transferring jobs." (Supp. R. 1335.) A.E.M. testified that she took B.N. to the doctor on June

12

9, 2020, and that "there were issues that came out of that appointment."

(Supp. R. 1354.)  She testified:

> "I had told the doctor that I was -- I was concerned with her eating habits, and he, you know, told me, you know, try these different, you know, eating habits.  He also -- I also let him know that she had a -- what I called a tick at the time where she would lay her right ear on her shoulder and she would shrug both of her shoulders, and he -- during the appointment he placed his hands on her shoulders and he was pushing down and she was still able to push her shoulders up.  He told me -- his report to me was that could be indicative of a neurological issue and he wanted to order a CT scan for her."

(Supp. R. 1354.)

A.E.M. offered explanations for some of the bruises on B.N.'s body. She explained that a "couple of small bruises on [B.N.'s] face" were from "us trying to pry her mouth open. …"  (Supp. R. 1381.)  She explained the mark on B.N.'s right temple:

> "[B.N.] had been in the crib.  She was tantrumming and I put her in the crib, and when I sat her down, I hadn't in the time noticed she had grabbed my sweater that I was wearing, and when I backed away from the crib, she was holding and she flipped over the railing of the crib, and she had landed head first, and received that rug burn."

(Supp. R. 1395-96.)  B.N. would "sometimes fall forward and into the wall or on the floor," she said.  (R. 1399.)

A.E.M. then explained some of the text messages that she exchanged with J.M.M.:

"[Defense counsel]: The text you sent [J.M.M.] is, she has got a lot of bruises on her face and her chin. We have to stop doing everything. She doesn't eat, fine, go to bed. What are you -- are you talking about?

"[A.E.M.]: Again, with the -- with the fingerprint bruises, right here, and also there is -- on her chin, there was like the bruises right here on this side. And I was calling it her chin, I believe, or maybe -- I believe that's what I was talking about.

"[Defense counsel]: When you say you -- we have to stop doing everything for, what is everything?

"[A.E.M.]: Oh. I just meant trying to force her to eat, to try to pry her mouth open, because it seemed like every time we did or trying to push her head up when we were rinsing her off, it seemed like every time we did, there would be little fingerprint bruises from where we were holding her."

(Supp. R. 1401-1402.)

"[Defense counsel]: And you're saying that there is -- [B.N.] has bruises all over her back, along her spine, from being thrown down and whatnot. We have to be careful. We are on the verge of losing [the second foster child] if anyone sees that. So what are you talking about?

"[A.E.M.]: There have been occasions where I had seen [J.M.M.] just put her down too hard on the floor when he was changing her diaper or we had a changing table and it usually had a pad on it, sometimes it didn't when it was getting cleaned, and it -- in my opinion, he sat her down a little too hard on the -- like the bare wood or on the floor where the carpet was."

14

(Supp. R. 1402-1403.) A.E.M. testified that she never spanked B.N., that she never popped B.N. with her hand, and that she never "threw her." (Supp. R. 1406-1407.) She said that B.N. frequently would "fall face first or back of the head first just to lay down," so they got her a helmet. (Supp. R. 1421.)

The jury chose to believe the State's account of the events that resulted in B.N.'s injuries and convicted J.M.M. and A.E.M. of aggravated child abuse. The circuit court sentenced J.M.M. and A.E.M. to life in prison. Both defendants filed notices of appeal to this Court.

## Standard of Review

Though the defendants were tried together, they each had different counsel. "Alabama law provides that in a multiple-defendant trial when an objection is made by one defendant's attorney the error is not automatically preserved for his codefendant." May v. State, 343 So. 3d 533, 537 (Ala. Crim. App. 2021).

> "Without some indication in the record that the judge accepted the objection made by one attorney as an objection for all three defendants, this court will not find that the judge did so. This court holds that each [defendant] was responsible for making his own objections."

T.R.D. v. State, 673 So. 2d 838, 844 (Ala. Crim. App. 1995).

15

Furthermore, pursuant to Rule 28(k), Ala. R. App. P., A.E.M. has incorporated in her brief the issues raised in J.M.M.'s brief. (A.E.M.'s brief at p. 58.) Rule 28(k) states: "In cases involving more than one appellant/petitioner or appellee/respondent, including cases consolidated for purposes of appeal, any number of either may join in a single brief, and any appellant/petitioner or appellee/respondent may adopt by reference any part of the brief of another."

We consider the following issues raised in the two briefs that were filed in this Court.

## J.M.M.'s Brief

### I.

J.M.M. first argues that the circuit court erred in denying his motion for a new trial because, he argues, the jury's verdict finding him guilty of aggravated child abuse was not supported by the great weight of the evidence. J.M.M. further argues that there was not sufficient evidence to show that he caused B.N.'s injuries because, he says, he was not B.N.'s primary caregiver and, unlike A.E.M., he did not delete text messages on the night of August 22.

The record shows that J.M.M. filed a motion for a new trial. (C. 197-207.) In that motion, J.M.M. argued, in part, that the evidence was contrary to the weight of the evidence. (C. 202.) He argued: "The evidence presented by the State at trial was not so strong as to lead a reasonable jury to conclude that [J.M.M.] committed aggravated child abuse or aided or abetted another in committing this offense." (C. 203.)

> "Once a prima facie case has been submitted to the jury, this Court will not upset the jury's verdict except in extreme situations in which it is clear from the record that the evidence against the accused was so lacking as to make the verdict wrong and unjust. Deutcsh v. State, 610 So. 2d 1212, 1234-35 (Ala. Cr. App. 1992). This Court will not substitute itself for the jury in determining the weight and probative force of the evidence. Benton v. State, 536 So. 2d 162, 165 (Ala. Cr. App. 1988)."

May v. State, 710 So. 2d 1362, 1372 (Ala. Crim. App. 1997).

> "The weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury. Morton v. State, 581 So. 2d 562 (Ala. Cr. App. 1991); Ward v. State, 356 So. 2d 238 (Ala. Cr. App.), cert. denied, 356 So. 2d 242 (Ala. 1978)."

Smith v. State, 698 So. 2d 189, 214 (Ala. Crim. App. 1996).

> "'[T]his Court does not sit as the trier of fact and reweigh the evidence; determining the weight to be afforded each piece of the evidence is well within the province of the jury.' Gargis v. State, 998 So. 2d 1092, 1096 (Ala. Crim. App. 2007). Indeed, '[a]ny issues regarding the weight and credibility of the

17

evidence are not reviewable on appeal once the state has made a prima facie case.' Jones v. State, 719 So. 2d 249, 255 (Ala. Crim. App. 1996), aff'd, 719 So. 2d 256 (Ala. 1998)."

Alexander v. State, 304 So. 3d 1207, 1213 (Ala. Crim. App. 2019). "To prove a prima facie case in a criminal prosecution, the State must 'fulfill its duty of proving the elements of the offense so that the jury may be allowed to consider its case.'" Gamble v. State, 699 So. 2d 978, 979 (Ala. Crim. App. 1997) (citation omitted). We view the evidence in the light most favorable to the State. See C.M. v. State, 889 So. 2d 57, 62-63 (Ala. Crim. App. 2004).

J.M.M. was convicted of the aggravated child abuse of a child under the age of six, a violation of § 26-15-3.1(b)(1), Ala. Code 1975. That statute provides, in relevant part:

"(b)(1) A responsible person, as defined in Section 26-15-2, [Ala. Code 1975,] commits the crime of aggravated child abuse of a child under the age of six if he or she does any of the following to a child under the age of six years:

"....

"c. He or she violates the provisions of Section 26-15-3 which causes serious physical injury as defined in Section 13A-1-2, [Ala. Code 1975,] to the child."

Section 26-15-2(5), Ala. Code 1975, defines "responsible person" as "[a] child's natural parent, stepparent, adoptive parent, legal guardian, custodian, or any other person who has the permanent or temporary care or custody of responsibility for the supervision of a child."

Section 13A-1-2(14), Ala. Code 1975, defines "serious physical injury" as "[p]hysical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ. ..."

The evidence, as set out above, was more than sufficient to establish a prima facie case of aggravated child abuse. The jury was instructed on the principles of accomplice liability. (Supp. R. 1860-61.) There was a plethora of evidence presented by the State indicating that J.M.M.. and A.E.M. acted jointly in abusing B.N. and trying to conceal that abuse. The weight of the evidence presented was strictly for the jury to determine. "This Court will not substitute itself for the jury in determining the weight and probative force of the evidence." May v. State, 710 So. 2d at 1372. "Any issues regarding the weight and credibility of evidence are not reviewable on appeal once the state has

19

made a prima facie case." Jones v. State, 719 So. 2d 249, 255 (Ala. Crim. App. 1996). There was more than sufficient evidence for the jury to convict A.E.M. and J.M.M. of aggravated child abuse. This Court has been cited to no reason to disturb the jury's verdict. For these reasons, J.M.M. and A.E.M. are due no relief on this claim.

## II.

J.M.M. next argues that the circuit court erred in refusing to instruct the jury on the lesser-included offense of third-degree assault because, he says, there was a reasonable theory from the evidence that "J.M.M. intended to and did cause physical injury to B.N. from his testimony admitting to causing bruises from roughly handling her and spanking her." (J.M.M.'s brief, p. 34.)

The record shows that J.M.M. requested jury instructions on assault in the third degree. (C. 130.) At the charge conference, the circuit court indicated that it would give the jury an instruction on the lesser offense of child abuse and would give the instruction that defense counsel had requested on that charge. (Supp. R. 1831.) Both defendants then requested jury instructions on assault in the third degree. (Supp. R.

1832.) After a lengthy discussion, the circuit court declined to give those instructions. (Supp. R. 1832-36.)

This Court has recognized that assault in the third degree may be a lesser-included offense of child abuse depending on the facts of the case. In considering facts that are sufficient to support such an instruction, this Court has stated:

> "[A]ssault in the third degree may be a lesser offense to child abuse. See Updyke v. State, 501 So. 2d 566, 567 (Ala. Cr. App. 1986); Miller v. State, 565 So. 2d 275, 276 (Ala. Cr. App. 1989). Citing Ex parte Jordan, 486 So. 2d 485 (Ala. 1986), the court in Updyke held that 'it is improper to find that a set of facts establishing the commission of an offense can never also establish the commission of a lesser included offense.' 501 So. 2d at 568. Relying on this proposition, this Court held in Updyke that '[d]espite the fact that child abuse does not require a showing of physical injury,' the 'facts showing the commission of child abuse could show also the commission of the offense of assault in the third degree.' Id. In certain cases, the jury should be 'allowed to determine whether the offense of assault in the third degree was committed.' Miller v. State, 565 So. 2d 275, 276 (Ala. Cr. App. 1989).

> "A court may, however, properly refuse to charge on a lesser included offense 'when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or when the requested charge would have the tendency to mislead or confuse the jury.' Chavers v. State, 361 So. 2d 1106, 1107 (Ala. 1978). Furthermore, under § 13A-1-9(b), Ala. Code 1975, '[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.' Moreover, the

21

determination of whether or not to give an instruction on assault in the third degree as a lesser offense to child abuse is to be made on a case-by-case basis. See Mosely v. State, 628 So. 2d 1041, 1043 (Ala. Cr. App. 1993) (an accused is not always entitled to instruction on a particular offense even though the offense is a lesser included one to the offense charged).

"....

"In a lengthy discussion at trial over the propriety of a jury instruction on third-degree assault, the trial court noted that an instruction on third-degree assault in this case could tend to confuse the jury. We agree. We also agree with the trial court's determination that an instruction on third-degree assault was not warranted under the facts of this case. While such an instruction may be necessary in some cases, it is not mandated in every case.

"As noted earlier, this court has held in two previous child abuse cases, Updyke and Miller, that the jury should have been instructed as to assault in the third degree. See Updyke, 501 So. 2d at 568; Miller, 565 So. 2d at 276. Updyke is factually distinguishable from the case at hand, however, and, unfortunately, the opinion in Miller does not recite the particular facts of the case. In Updyke, the appellant was convicted of child abuse for beating his seven-year-old son with a wet belt. See Updyke, 501 So. 2d at 567. Judging from the facts contained in the opinion, the conviction was based upon a single beating, rather than a series of beatings. See id. The beating by the appellant was allegedly the result of the child lying to the appellant about his grades in school. See id. We reversed the appellant's conviction based upon the trial court's failure to instruct the jury on assault in the third degree. See id. at 568.

"The facts of this case can be easily distinguished from the facts of Updyke. First, Updyke involved a solitary

22

incident of abuse. In sharp contrast, the evidence presented in this case indicates that the two victims were subjected to a pattern of cruel and abusive behavior by their father over an extended period of time. Second, the abuse in Updyke was a purely physical beating. Here, the repeated abuse entailed much more than physical injuries. The abuse by the appellant involved not only physical beatings but also mental and sexual maltreatment, including whipping the children with a belt, threatening the children with a gun, stomping on the children's toys, calling the son a 'stupid son of a bitch,' forcing the daughter to 'snuggle' with the appellant so that he could rub her 'private parts,' and threatening the children with future beatings if they told their mother about the abuse.

"....

"It follows that, in the present case, the trial court's refusal to charge the jury on third-degree assault was not error. While assault in the third degree can be considered a lesser included offense of child abuse in some cases like Updyke, this court declines to hold that it is in this case. As stated earlier, the decision to instruct the jury on lesser included offenses depends upon the facts of the particular case. See Mosely, 628 So. 2d at 1043. Moreover, while it goes too far to state that a set of facts can never also satisfy the elements of a lesser included offense, it is also incorrect to suggest that in certain cases, such as child abuse situations, the facts will always warrant a charge on both the greater and the lesser included offense. Based on the factual differences between this case and Updyke, the trial court's refusal to instruct the jury on assault was proper. The appellant inflicted much more than physical injury upon the victims, and the abuse occurred over a long period of time."

T.D.T. v. State, 745 So. 2d 885, 889-93 (Ala. Crim. App. 1998).

In affirming this Court's holding in T.D.T., the Alabama Supreme Court stated:

"[T]he trial court properly refused to charge the jury on the offense of assault in the third degree because, under the particular facts shown by the evidence in this case, T.D.T. was guilty either of child abuse or of no crime at all. T.D.T. admitted to striking the children as a form of discipline, but he denied some of the severe abuse alleged by the children. He argues that 'the jury should have been allowed to consider whether [he,] "with intent to cause physical injury to another person, [caused] physical injury to any person,"' quoting § 13A-6-22(a)(1), Ala. Code 1975. If the jury had believed T.D.T. and found he was simply disciplining his children, then the jury would have had to acquit him. If the jury believed the children and found that T.D.T.'s actions were not discipline, then the actions constituted child abuse. In other words, had the jury found that T.D.T. intended to cause physical injury to his children when he hit them, then the jury would necessarily have had to find T.D.T. guilty of 'child abuse,' which includes the 'willful abuse' or 'cruel beating' of a child by a 'responsible person.' § 26-15-3, Ala. Code 1975. Therefore, the refusal to instruct the jury on third-degree assault was not error."

Ex parte T.D.T., 745 So. 2d 899, 905 (Ala. 1999).

In these cases, both doctors who treated B.N. testified that the injuries inflicted on B.N. did not occur from one act but were the result of multiple acts over a period. Like in Updyke v. State, 501 So. 2d 566 (Ala. Crim. App. 1986), the abuse in these cases went well beyond one physical beating. Based on this Court's and the Alabama Supreme

24

Court's decisions in T.D.T., we find that the circuit court did not abuse it discretion in refusing to instruct the jury on assault in the third degree as a lesser-included offense of aggravated child abuse. Accordingly, J.M.M. and A.E.M. are due no relief on this claim.

## III.

J.M.M. next argues that the circuit court erred in imposing $3,547.80 in restitution because, he argues, there is no provision in the law that allows for the State to recover restitution or court costs related to an expert witness in a criminal case. The State asserts that this challenge to the sentencing order is moot because, it says, the circuit court modified its original sentencing orders.

At the sentencing hearing on December 19, 2023, the circuit court directed that both J.M.M. and A.E.M. pay $25,000 in court costs and $3,547.80 in "cost[s] that were requested by the State." (Supp. R. 1887.) At that hearing, the State indicated that this amount was for expenses associated with Dr. Peters and that the amount included "copy fees and testimony fees for Dr. Peters, and travel fees, as well as Auburn AB Video for helping us set up the video link for the children to testify." (Supp. R. 1886.) In the sentencing orders, the amount requested by the State is

listed as restitution. (C. 18.) The record also shows that a few days after the sentencing hearing, the State filed a document entitled "Restitution Affidavit" requesting the amount of $3,547.80 in restitution. J.M.M. filed a lengthy objection to this restitution and argued that the State is not a victim and that, according to § 15-18-67, Ala. Code 1975, the State could not recover restitution. (C. 185-193.) Alternatively, J.M.M. requested that the amount be cut in half so that both defendants shared this cost. (C. 191.) The State then moved that the sentencing orders be amended "to reflect that the money owed to the District Attorney's Office in the amount of $3,547.80 was requested as Court Costs reimbursable to the District Attorney's Office and not as restitution." (C. 196.) This issue was also raised in J.M.M.'s motion for a new trial and adopted by A.E.M. in her motion for a new trial. The circuit court denied J.M.M.'s motion for a new trial on February 6, 2024, and denied A.E.M.'s motion for a new trial on February 15, 2024. J.M.M. and A.E.M. filed timely notices of appeal. The supplemental record shows that, more than eight months later, on October 11, 2024, the circuit court issued amended sentencing orders designating the money not as restitution but as costs and further

26

ordering that each defendant pay $1,773.90, or half of, the State's costs. (Supp. C. 19.)

Typically, "a trial court retains jurisdiction to modify a sentence for 30 days after that sentence is pronounced." State v. Monette, 887 So. 2d 314, 315 (Ala. Crim. App. 2004). "[I]f a motion for a new trial or a request to modify a sentence is not filed within 30 days after sentencing, then at the end of the 30th day the trial court loses all jurisdiction to modify a defendant's sentence." Ex parte Hitt, 778 So. 2d 159, 162 (Ala. 2000). Here, a motion for a new trial was timely filed within 30 days from the pronouncement of sentencing. That motion extended the jurisdiction of the circuit court beyond the 30-day period. See Rule 24.4, Ala. R. Crim. P.

> "Rule 24.4 specifically provides that a court has jurisdiction to rule on a motion for a new trial for 60 days after sentencing, at which point the motion is deemed denied by operation of law; that period can also be extended past 60 days, but only by express agreement of the parties. Rule 24.4 was adopted to promote 'finality of judgments.' Edgar v. State, 646 So. 2d 683, 686 (Ala.1994)."

Loggins v. State, 910 So. 2d 146, 149 n. 3 (Ala. Crim. App. 2005).

However, in this case, the postjudgment motions were denied by the circuit court on February 6, 2024, and February 15, 2024, respectively.

27

After the motions were denied, the circuit court lost jurisdiction of the case. Because a notice of appeal had been filed, jurisdiction of this case was solely in this Court after February 6, 2024. "The general rule is that jurisdiction of one case cannot be in two courts at the same time." Ex parte Hargett, 772 So. 2d 481, 483 (Ala. Crim. App. 1999). One exception to this general rule is that a court may correct a clerical error in an order. Rule 29, Ala. R. Crim. P., provides:

> "Clerical mistakes in judgments, orders, or other parts of the record, and errors arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal or thereafter, such mistakes may be so corrected by the trial court. Whenever necessary, a transcript of the record as corrected may be certified to the appellate court in response to a writ of certiorari or like writ, in conformity with Rule 10(f), A. R. App. P."

Orders issued under Rule 29 may be issued at any time. While the October orders could be deemed, in part, to be Rule 29 orders correcting the judgments to read that the award of costs was not restitution, the

28

court had no jurisdiction to modify the amount of costs more than eight months after the original orders had been issued.[3]

Regardless, we find that the circuit court could not direct the defendants to reimburse the State for the costs for its expert witness. First, we agree with J.M.M. that the State is not a victim as that term is defined in the restitution statutes, § 15-18-65 et seq., Ala. Code 1975. For purposes of restitution, § 15-18-66(4), Ala. Code 1975, defines "victim" as "[a]ny person whom the court determines has suffered a direct or indirect pecuniary damage as a result of the defendant's criminal activities. 'Victim' shall not include any participant in the defendant's criminal activities."

This Court, in Grace v. State, 899 So. 2d 302 (Ala. Crim. App. 2004), addressed whether Crime Stoppers and the Governor's Office were victims within the meaning of the restitution statutes. This Court held that they could not recover restitution as "the payors of rewards" because

---

[3]But see Dixon v. State, 920 So. 2d 1122, 1129 (Ala. Crim. App. 2005) ("In State v. Redmon, 885 So. 2d 850 (Ala. Crim. App. 2004), this Court held that a trial court had jurisdiction to amend its restitution order to address the matter of restitution for a third victim to whom restitution had not yet been awarded, even though the amendment to the restitution order was made more than 30 days from the date of sentencing.").

they were not victims. It further found that the restitution statutes are not ambiguous or subject to interpretation.

> "The legislative purpose of the restitution act was to fully compensate victims for 'any pecuniary loss, damage or injury' suffered as a direct or indirect result of a criminal act. § 15-18-65. 'Victim' is defined in the act as '[a]ny person whom the court determines has suffered a direct or indirect pecuniary damage as a result of the defendant's criminal activities.' § 15-18-66(4). We have construed 'victim' to encompass persons who were not necessarily the primary object of the defendant's criminal conduct. See Harris v. State, 542 So. 2d 1312 (Ala. Cr. App. 1989); Kyser v. State, 513 So. 2d 68 (Ala. Cr. App. 1987); Welcher v. State, 504 So. 2d 360 (Ala. Cr. App. 1987). The act provides that a victim may recover from a convicted defendant all special damages that a person could have recovered in a civil suit. § 15-18-66(2). Special damages are those that flow naturally but not necessarily from a wrongful act. McLendon Pools, Inc. v. Bush, 414 So. 2d 92 (Ala. Civ. App. 1982)."

Butler v. State, 608 So. 2d 773, 775 (Ala. Crim. App. 1992). Because the State is not a victim, it could not recover restitution.

Second, the Alabama Supreme Court has long held that costs may not be recovered by a party unless specifically provided by statute.

> "At common law costs were not recoverable by either party, in any case civil or criminal. They are given by statute, and it is declared 'the law of costs must be deemed and held a penal law, and no fee must be taken but in cases expressly provided by law.' -- R.C. § 3534; Stewart v. Hood, 10 Ala. 600 [(1846)]; Lee v. Smyley, 16 Ala. 773 [(1849)]; Dent & McGruder v. State, 42 Ala. 514 [(1868)]; Tuck v. State, 8 Ala. 664 [(1845)]."

30

City Council of Montgomery v. Foster, 54 Ala. 62, 63 (1875).

More recently, the Alabama Supreme Court has stated:

"The right to recover costs exists only as granted by statute, because there was no such right at common law. State v. Inman, 239 Ala. 348, 195 So. 448 (1940); Ex Parte Cudd, 195 Ala. 80, 70 So. 721 (1916). Prior to the adoption of the Rules of Appellate Procedure, the first section of the title of the Code of Alabama governing costs and fees stated that '[t]he law of fees and costs must be held to be penal, and no fee must be demanded or received except in cases expressly authorized by law.' Code 1940 (Recomp. 1958), title 11, § 1. Although this provision was not brought forward into the 1975 Code, the principle that the law of costs and fees is penal, and to be strictly construed, has long been cited and approved without reference to the Code section. Chatman v. Pizitz, Inc., 429 So. 2d 969 (Ala. 1983); Keith v. Lewis, 274 Ala. 145, 145 So. 2d 841 (1962); Cabler v. Mobile County, 230 Ala. 118, 159 So. 692 (1935)."

Ex parte Purcell Co., 451 So. 2d 801, 802 (Ala. 1984).

Alabama appellate courts have also held that the cost of an expert witness is not recoverable unless provided by law.

"'The court cannot award [an] expert's fees as a matter of costs unless provided by statute.' Cooper v. Cooper, 57 Ala. App. 674, 331 So. 2d 689, 694-95, cert. denied, 331 So. 2d 695 (Ala. 1976); Hartley v. Alabama National Bank of Montgomery, 247 Ala. 651, 25 So. 2d 680 (1946). No Alabama statute provides for an award of an expert's fee in this case. We note that in Cooper, this court said that it seems that expenses such as the expert's fee should be taken into account in determining an attorney fee. However, because the attorney fee was determined separately from the expert fee,

31

to go back and award the expert fee as part of the attorney fee would be contrary to the rule stated in Cooper and Hartley. Therefore, the trial court erred in ordering the husband to pay the fees of the wife's expert witness."

Davis v. Davis, 686 So. 2d 1245, 1249-50 (Ala. Civ. App. 1996). "Although, generally, an expert witness is not taxable as a cost of an action, Hartley v. Alabama Nat'l Bank of Montgomery, 247 Ala. 651, 25 So. 2d 680 (1946), this court and the supreme court have allowed an expert witness fee to be included as an item of costs in workers' compensation actions." Star Rails, Inc. v. May, 709 So. 2d 44, 46 (Ala. Civ. App. 1997). This Court can locate no statute that authorizes the State to recover the costs for its expert witness in a criminal case.

The State further asserts that this issue is not properly before this Court because, it says, the defendants received the relief that they requested and, thus, have no adverse ruling from which to appeal. However, when an order issued is outside the scope of a court's jurisdiction that order may be challenged at any time. "'"[A] void court order is a complete nullity.' Hodges v. Archer, 286 Ala. 457, 459, 241 So. 2d 324, 326 (1970). As a nullity, a void judgment has no effect and is subject to attack at any time.'" State v. Utley, 94 So. 3d 414, 416 (Ala. Crim. App. 2012). Because the circuit court had no legal authority to

32

order the defendants to reimburse costs to the State for its expert witness, this issue is properly before this Court in these appeals. Therefore, these cases are due to be remanded for the circuit court to set aside its orders directing J.M.M. and A.E.M. to pay the costs for the State's expert witness.

We now consider the issues raised in A.E.M.'s brief to this Court.

A.E.M.'s Brief

IV.

A.E.M. first argues that the circuit court abused its discretion in denying her motion to suppress text messages that were exchanged between her and J.M.M. because, she argues, those messages were privileged communications between spouses and were protected by Rule 504(a), Ala. R. Evid. The State argues that the spousal privilege has no application in these cases because of the nature of the crime.

The record shows that at a pretrial hearing this motion was discussed. The State indicated that there were over 1,000 pages of text messages and that it would narrow down what it intended to present at trial. (Supp. R. 24-25.) A lengthy discussion was held at a second hearing regarding individual text messages and their admissibility. (Supp. R. 52-

130.) At the conclusion of that hearing, the circuit court stated: "I find that the text messages fall within the exceptions carved out in Alabama law in regards to the admission of spousal communications being allowed in criminal proceedings as laid out in Alabama law." (Supp. R. 130.)

Rule 504(b), Ala. R. Evid., states: "In any civil or criminal proceeding, a person has a privilege to refuse to testify, or to prevent any person from testifying, as to any confidential communication made by one spouse to the other during the marriage."

Rule 504(d) recognizes exceptions to this general rule and provides:

"There is no privilege under this rule:

"....

"(2) Furtherance of Crime. In any criminal proceeding in which the spouses are alleged to have acted jointly in the commission of the crime charged.

"(3) Criminal Action. In a criminal action or proceeding in which one spouse is charged with a crime against the person or property of (A) the other spouse, (B) a minor child of either, (C) a person residing in the household of either, or (D) a third person if the crime is committed in the course of committing a crime against any of the persons previously named in this sentence."

The Advisory Committee's Notes to Rule 504(d)(2), provide:

"Any inter-spousal communication falls outside the privilege if it is made in furtherance of a crime in which both spouses are engaged. As under the attorney-client privilege, communications in furtherance of criminal activity are not immune from disclosure. Compare Ala. R. Evid. 502(d)(1).

"This rule is consistent with preexisting case law adopting an exception to the husband-wife privilege for communications between spouses relating to crimes in which they are jointly participating when the communications occur. State v. Browder, 486 So. 2d 504 (Ala. Crim. App. 1986). This exception applies only to communications that are in furtherance of, or pertain to, the crime charged. The communications are nonprivileged, even if the testifying spouse's only involvement in the crime charged is as an accessory after the fact. See United States v. Mendoza, 574 F.2d 1373 (5th Cir.), cert. denied, 439 U.S. 988 (1978)."

In State v. Browder, 486 So. 2d 504 (Ala. Crim. App. 1986),[4] a case

cited in the Advisory Committee's Notes, this Court stated:

"In United States v. Mendoza, 574 F.2d 1373 (5th Cir.), cert. denied, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978), the Fifth Circuit examined the policies underlying the confidential communications privilege in conjunction with the exception to the rule established in the Seventh Circuit (which the 5th Circuit viewed as being adopted by the Second Circuit in United States v. Cotroni, 527 F.2d 708 (2d Cir. 1975), cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976)). The Mendoza court stated:

"'Accordingly, we have weighed the need for truth against the importance of the policy sought to be furthered by the privilege, and considered the

_____

[4]Browder was released before the adoption of the Alabama Rules of Evidence on January 1, 1996.

35

likelihood that recognizing the privilege in the factual setting of this case will in fact further that policy, and, if so, how much. ... The result is that this Court is now convinced that the rule of the Second and Seventh Circuits strikes the proper balance between domestic tranquility and the public interest therein, on the one hand, and the revelation of truth and attainment of justice, which also are in the public interest, on the other. Therefore, we hold that conversations between husband and wife about crimes in which they are jointly participating when the conversations occur are not marital communications for the purpose of the marital privilege and thus do not fall within the privilege's protection of confidential marital communications.'"

486 So. 2d at 506.

In applying this exception, this Court in Craft v. State, 90 So. 3d 197 (Ala. Crim. App. 2011), stated:

"As the Advisory Committee's Notes state, the furtherance-of-crime exception to the husband-wife privilege in Rule 504 is consistent with [State v.] Browder[, 486 So. 2d 504 (Ala. Crim. App. 1986)]. In the present case, Jones's testimony clearly reveals that she helped Craft move the victim's body from the house and conceal it in a well. Like the communications the husband was allowed to testify to in Browder, the communications Jones testified to pertained to criminal activities, in which both she and Craft were participating in covering up the crime. Those marital communications had to do with the commission of the crime and not with the privacy of the marriage itself and, thus, fall within the furtherance-of-crime exception to the protection of the privilege. The information sought had nothing to do with intimate marital relations, and the privacy interests of the

36

husband and wife were not at stake. Therefore, the husband-wife privilege cannot be invoked to protect Craft from the voluntary incriminating testimony of Jones; thus, the trial court did not err in allowing Jones to testify as to the communications between her and Craft that related to covering up the crime in which they were jointly participating when the communications occurred."

90 So. 3d at 210-11. See also <u>Montanez v. State</u>, 592 So. 2d 650, 653 (Ala. Crim. App. 1991) ("Testimony regarding conversations between spouses who are joint participants in a crime is not protected by the marital communications privilege.").

Other jurisdictions have applied this exception to the spousal privilege. See <u>State v. Terry</u>, 430 N.J. Super. 587, 603, 66 A. 3d 177, 187 (2013) ("Indeed, all eleven federal circuits that have faced the issue have concluded that communications between spouses jointly engaging in criminal activity are excluded from the marital communications privilege."); <u>United States v. Byrd</u>, 750 F.2d 585, 589 (7th Cir. 1984) ("The 'joint participants' exception holds that the privilege does not apply where the spouses are both participants in the crime at issue.").

We agree with the circuit court that the text messages exchanged between A.E.M. and J.M.M. were admissible as an exception to the spousal-communication privilege because they were made in furtherance

of J.M.M.'s and A.E.M.'s joint participation in abusing B.N. and seeking to conceal that abuse. The circuit court did not abuse its discretion in allowing the text messages to be admitted into evidence. Accordingly, A.E.M. is due no relief on this claim.

V.

A.E.M. next argues that the State should have been required to elect which offense it was presenting to the jury. She relies, in part, on Deason v. State, 363 So. 2d 1001 (Ala. 1978), to support her argument.

The record shows that, at the conclusion of the State's case, A.E.M. requested that the "State be required to make an election of what injury … we are defending against, specifically because there has been a lot of things alleged. What specifically we are defending against in our portion of the case." (R. 1293.) The circuit court denied the motion. (R. 1294.)

As stated above, A.E.M. relies on Deason to argue that the strict rules of election applied in this case. However, the Alabama Supreme Court, at this Court's urging, modified the strict election requirement discussed in Deason. The Alabama Supreme Court, in R.A.S. v. State, 718 So. 2d 117 (Ala. 1998), stated:

> "The Court of Criminal Appeals reversed the defendant's conviction, R.A.S. v. State, 718 So. 2d 108 (Ala.

38

Cr. App. 1997), basing its reversal on this Court's holding in Ex parte King, 707 So. 2d 657 (Ala. 1997), in which a majority of this Court declined to overrule or to make an exception to the long-standing doctrine of election as it was enunciated in Deason v. State, 363 So. 2d 1001 (Ala. 1978), and Watkins v. State, 36 Ala. App. 711, 63 So. 2d 293 (1953).

"Even though the Court of Criminal Appeals reversed the defendant's conviction, it specifically urged this Court to consider extending the expansion of the strict election rule to apply to cases based upon generic and specific evidence, such as this one. The court wrote:

"'In our opinion in R.L.G. v. State, 712 So. 2d 348 (Ala. Cr. App. 1997), released today, in recognition of the unique problems posed by the prosecution of alleged resident child molesters, we adopted a less strict election rule to be applied to "generic evidence" cases. This expanded rule cannot be applied here because the prosecution's evidence was not purely generic. However, we do find it appropriate ... to urge the Alabama Supreme Court, as we did in R.L.G., to consider extending our expansion of the strict election rule to apply to cases based upon generic and specific evidence, such as this one. In our opinion, such expansion would achieve a fairer balance of the realities of the nature of the evidence of sex offenses repeatedly committed against the same child by a resident abuser and the rights of the defendant, the nature of which [evidence] is peculiar to the narrow class of sex offenses allegedly committed by a resident molester.'

"718 So. 2d at 116. We granted the State's petition for the writ of certiorari primarily to consider, as requested by the Court of Criminal Appeals, reexamining the holding in Ex parte King and to consider extending the expansion of the

39

strict election rule to apply to cases based upon generic and specific evidence.

> "After reexamining the holding in Ex parte King and the holding in Ex parte R.L.G., we agree with the State that the strict election rule should be expanded in cases that, like this one, involve a resident child molester and in which there is both generic evidence and specific evidence indicating that multiple acts of molestation have occurred over an extended period."

718 So. 2d at 119.

Like in R.A.S., in this case there was evidence of one specific act that ended with B.N. in the emergency room, but the State also presented evidence of a pattern of abuse that resulted in numerous injuries and broken bones. Thus, the strict rule of election did not apply in this case. As this Court has explained:

> "Generally, Alabama follows a strict-election rule, by which the State must elect the offense on which it will proceed '[w]here the evidence discloses two or more offenses growing out of distinct and separate transactions.' R.L.G. v. State, 712 So. 2d 348, 355 (Ala. Crim. App. 1997), aff'd, 712 So. 2d 372 (Ala. 1998) (internal quotation marks omitted). However, the strict-election rule does not apply in cases of sexual abuse of children by a resident abuser that involve purely generic evidence, i.e., 'evidence of sexual abuse perpetrated upon a young child so often and in so many locations "by an abuser residing with the child ... that the young child loses any frame of reference in which to compartmentalize the abuse into 'distinct and separate transactions,'"' or that involve a combination of both specific and generic evidence. Shouldis v. State, 38 So. 3d 753, 761 n.4 (Ala. Crim. App. 2008) (quoting

40

"R.L.G., 712 So. 2d at 356). In those cases, the either/or rule applies: 'The "either-or" rule provides that the prosecution must elect which single act it is relying [on] for a conviction or else the trial judge must give a specific unanimity instruction.' R.A.S. v. State, 718 So. 2d 117, 119 (Ala. 1998).

> "'[T]he "either/or" rule ... as that rule is modified for generic evidence [provides that] where the evidence of more than one incident of sexual molestation to a child victim by a resident child molester is purely generic and where "there is no reasonable likelihood of juror disagreement as to particular acts, and the only question [for the jury] is whether or not the defendant in fact committed all of [the incidents]," the trial court should instruct the jury that it can find the defendant guilty only if it unanimously agrees that he committed all the incidents described by the victim.'

"R.L.G., 712 So. 2d at 367 (emphasis omitted).  Moreover:

> "'In cases, such as this one, that involve both generic and specific evidence, where evidence of multiple culpable acts is adduced to prove a single charged offense, jury unanimity must be protected.  Therefore, in such a case, the defendant is entitled either to have the State elect the single act upon which it is relying for a conviction or to have the court give a specific unanimity instruction. If the State chooses not to elect the specific act, the trial court must instruct the jury that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, thereby assuring a unanimous verdict on one criminal act.'

"R.A.S., 718 So. 2d at 122 (footnote omitted)."

41

State v. Kerley, 260 So. 3d 891, 898-99 (Ala. Crim. App. 2017).

As noted above, when evidence of both generic and specific instances of abuse is presented, if the State does not elect a specific instance, then the court should give the jury an unanimity instruction. Here, although A.E.M. requested that the State elect, she did not request an unanimity instruction, and an unanimity instruction was not given by the circuit court ex mero motu. Nonetheless, this Court has held that the failure to give an unanimity instruction may be harmless.

> "In R.L.G. [v. State, 712 So. 2d 348 (Ala. Crim. App. 1997),] this Court recognized that an error under the either/or rule may be harmless in certain circumstances:
>
> > "'Although the trial court erred, we conclude that it is harmless error. In [People v.] Jones, [51 Cal. 3d 294, 270 Cal. Rptr. 611, 792 P.2d 643 (1990),] the court observed that "[s]ome cases found harmless any error in failing either to select specific offenses or [to] give an unanimity instruction, if the record indicated the jury resolved the basic credibility dispute against defendant and would have convicted the defendant of any of the various offenses shown by the evidence to have been committed." 51 Cal. 3d at 307, 270 Cal. Rptr. at 617, 792 P.2d at 649 (emphasis in original; citing People v. Moore, 211 Cal. App. 3d 1400, 1415-16, 260 Cal. Rptr. 134 (1989); People v. Winkle, 206 Cal. App.3d [822,] at 828-30, 253 Cal. Rptr. 726 [(1988)]; People v. Schultz, 192 Cal. App. 3d 535, 539-40, 237 Cal. Rptr. 513 (1987); People v. Deletto, 147 Cal. App.

> 3d 458, 466, 470-73 & n.10, 195 Cal. Rptr. 233 (1983), cert. denied, 466 U.S. 952, 104 S.Ct. 2156, 80 L.Ed.2d 542 (1984)).  For example, in <u>Winkle</u>, the victim testified that the defendant, her uncle, had molested her regularly each week; the prosecution made no election and no unanimity instruction was given.  The court concluded that no prejudice resulted. Because the defendant made only a weak attempt to assert an alibi defense, the ultimate question for the jury was the defendant's credibility and the verdict necessarily implied that the jury unanimously believed the victim.'"

<u>State v. Kerley</u>, 260 So. 3d at 899-00.  See also <u>Williams v. State</u>, 389 So. 3d 385, 398 (Ala. Crim. App. 2023) ("[A]ny failure to give an unanimity instruction was harmless based on this Court's decision in <u>R.L.G.</u>"); <u>Colburn v. State</u>, 395 So. 3d 117 (Ala. Crim. App. 2023) ("Even if the circuit court's instruction was insufficient, that error was harmless. '[T]he jurors must necessarily have unanimously rejected [the appellant's] defense and, by believing [the appellants], unanimously found that all the incidents occurred.'")

In these cases, the question for the jury to resolve was the credibility of A.E.M. and J.M.M.  The verdicts show that the jury did not believe the defendants' account of B.N.'s injuries; thus, according to the above-cited cases, the failure to give an unanimity instruction was

harmless. See State v. Kerley, supra. Given the facts in this case, we find that the circuit court did not commit reversible error in not requiring the State to elect what count it intended to present to the jury. For these reasons, A.E.M. is due no relief on this claim.

VI.

A.E.M. last argues that the circuit court abused its discretion in sentencing her to life imprisonment. A.E.M. cites no caselaw but relies on Rule 26.8, Ala. R. Crim. P. Specifically, A.E.M. asserts that the circuit court should have considered that she was a "decorated former service member," that she has two children, and that she spent her time in jail awaiting sentence taking "personal improvement courses." (A.E.M.'s brief, pp. 56-57.) The State argues that the circuit court did not abuse its discretion in sentencing A.E.M. to life imprisonment. In her brief, A.E.M. makes no argument that her sentence is cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

The record shows that, before sentencing, A.E.M. filed a motion entitled "Defendant's Presentence Report." (C. 139-142.) In that motion, A.E.M. set out the same arguments she makes in her appellate brief and asserted that she should be sentenced to the least restrictive sentence

44

based on her background. In A.E.M.'s motion for a new trial, she also asserted: "Defendant [A.E.M.] maintains that the life sentence does not properly 'consider alternatives to long-term institutional confinement or incarceration,' and does not represent the 'least restrictive' sanction given Defendant [A.E.M.'s] lack of criminal history and service to her country and her community." (C. 227-28.)

Rule 26.8, Ala. R. Crim. P., states:

> "The sentence imposed in each case should call for the least restrictive sanction that is consistent with the protection of the public and the gravity of the crime. In determining the sentence, the court should evaluate the crime and its consequences, as well as the background and record of the defendant and give serious consideration to the goal of sentencing equality and the need to avoid unwarranted disparities.

> "Judges should be sensitive to the impact their sentences have on all components of the criminal justice system and should consider alternatives to long-term institutional confinement or incarceration in cases involving offenders whom the court deems to pose no serious danger to society."

A.E.M. was convicted of aggravated child abuse of a child under the age of six years, a Class A felony, as provided in § 26-15-3.1(b)(2), Ala. Code 1975. Pursuant to § 13A-5-6(a)(1), Ala. Code 1975, the sentencing range for a Class A felony is between 10 years and life imprisonment.

"It is well settled that '[w]here a trial judge imposes a sentence within the statutory range, this Court will not disturb that sentence on appeal absent a showing of an abuse of the trial judge's discretion.' Alderman v. State, 615 So. 2d 640, 649 (Ala. Crim. App. 1992). 'The exception to this general rule is that "the appellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense charged that it constitutes a violation of a defendant's Eighth Amendment rights."' Brown [v. State, 611 So. 2d 1194,] 1197, n. 6 [(Ala. Crim. App. 1992)], quoting Ex parte Maddox, 502 So. 2d 786, 789 (Ala. 1986)."

Adams v. State, 815 So. 2d 583, 585 (Ala. Crim. App. 2001). A.E.M. makes no Eighth Amendment argument regarding her sentence in her brief to this Court.

Dr. Reamy testified that when she saw B.N. she was horrified by the extent of B.N.'s injuries and that in her 30 years of treating pediatric injuries she had never seen a "worse case of non-fatal abuse." (Supp. R. 742-43.) The circuit court did not abuse its considerable discretion in sentencing A.E.M. and J.M.M. to life in prison.

## Conclusion

For the above-stated reasons, we affirm J.M.M.'s and A.E.M.'s convictions for the aggravated child abuse of B.N. As stated in Part III of this opinion, we remand these cases to the Russell Circuit Court for that court to set aside that part of its sentencing order directing J.M.M.

46

and A.E.M. to pay the costs for the State's expert witness. Due return should be filed in this Court within 42 days from the date of this opinion.

CR-2024-0086 -- AFFIRMED AS TO CONVICTION; REMANDED WITH INSTRUCTIONS TO CORRECT SENTENCING ORDER.

CR-2024-0157 -- AFFIRMED AS TO CONVICTION; REMANDED WITH INSTRUCTIONS TO CORRECT SENTENCING ORDER.

Windom, P.J., and Minor and Anderson, JJ., concur. Cole, J., concurs in the result.